UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

Freddie McNeill, Jr.,          ) Case No. 1:02 CV 1645
                                         )
             Petitioner,       )
                                         ) JUDGE DAN AARON POLSTER
     -vs-                  )
                                         )
Margaret Bagley, Warden,      ) **MEMORANDUM OF OPINION**
                                         ) **AND ORDER**
             Respondent.     )

## INTRODUCTION

Petitioner Freddie McNeill, Jr., was convicted and sentenced to death in an Ohio

state court for the aggravated murder of Blake Fulton. McNeill has now filed a petition

and amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging

the constitutionality of his convictions and sentence. (Docs. 21, 137.)[1] Respondent

Warden Margaret Bagley has filed a return of writ to the amended petition. (Doc. 141.)

McNeill has filed an amended traverse. (Doc. 144.) And Respondent has filed a sur-reply.

(Doc. 145.) For the reasons stated below, the Court denies McNeill's amended petition.

---

[1] This case was transferred to the undersigned on July 20, 2017, from United States District
Court Judge Lesley Wells upon her retirement.

## FACTUAL HISTORY

The Ohio Supreme Court set forth the following facts underlying McNeill's convictions:

> On the evening of May 13, 1994, Blake Fulton and Robert Rushinsky drove about the city of Lorain seeking to purchase crack cocaine. Seeing several men they believed to be crack dealers at the corner of Massachusetts Avenue and G Street, the two stopped. As was customary, the first dealer to the car, McNeill, got the sale.

> Fulton and Rushinsky knew McNeill from prior drug transactions. Rushinsky, who was riding in the front passenger seat of the two-door car, let McNeill into the back. As McNeill directed, Fulton drove south on Massachusetts Avenue and headed for McNeill's residence, where McNeill stated he kept the crack cocaine. As they drove, McNeill asked Fulton for twenty dollars. Fulton replied: "No. * * * You know how it works. I want to see [the crack] first." Fulton and McNeill continued to argue about the money. When the trio reached McNeill's house, Fulton stopped the car. McNeill produced a gun, saying, "This is a stickup," and "I want the money." Fulton jumped from the car and ordered McNeill out. As Rushinsky leaned forward and opened his door, McNeill grabbed the keys from the ignition and jumped out.

> McNeill aimed his gun at Rushinsky and asked if he had any money. Rushinsky replied he had none. McNeill then pointed the gun at Fulton, saying, "You don't think this gun's real?" and "You don't think this thing's loaded?" Fulton told McNeill to return his keys. After further argument, McNeill walked away. Fulton, who was a locksmith, got into his car and attempted to start it using his locksmith's tools.

> While Fulton was trying to start the car, McNeill returned. McNeill put his gun to Fulton's head, said, "Played me for a bitch," and shot Fulton. Fulton died several hours later.

*State v. McNeill*, 83 Ohio St. 3d 438, 438-39 (Ohio 1998).

## PROCEDURAL BACKGROUND

### A. State-Court Proceedings

#### 1. Trial Court

In May 1994, the Lorain County Grand Jury indicted McNeill for aggravated murder under Ohio Rev. Code § 2903.01(B) with a firearm specification and a death penalty specification that the murder occurred in the course of an aggravated robbery. (Doc. 116-1 at 14.)[2] McNeill, represented by Joseph Grunda and Robert Nagy, entered pleas of not guilty to all charges. (*Id*. at 19.)

McNeill's trial began on April 10, 1995. (*See* Doc. 117-1 at 63.) He was still represented by Attorneys Grunda and Nagy. (*See id*.) On April 14, 1995, the jury convicted McNeill of aggravated murder and both specifications. (Doc. 116-1 at 184-85.) The penalty phase of the trial began on May 1, 1995, and on May 3, 1995, the jury recommended that McNeill be sentenced to death. (*Id*. at 178-79.) On May 12, 1995, the trial court accepted the jury's recommendation and imposed a death sentence. (*See id*. at 184-85.)

#### 2. Direct Appeal

On June 21, 1995, McNeill, represented by new counsel David Bodiker, Kevin Fahey, and Joseph Wilhelm of the Office of the Ohio Public Defender, timely appealed his convictions and sentence to the Ninth Judicial District Court of Appeals. (*Id*. at 209-10.) In his appellate brief, he raised sixteen assignments of error, stated as follows:

> 1. Mr. McNeill was wrongfully convicted of violating Ohio Rev. Code Ann. § 2903.01(B) (Anderson 1996) and of the specification of

---

[2] All references to page numbers of documents in the Court's electronic court filing system ("ECF") are to the page numbers of the individual ECF documents, not to the original documents' page numbers or ECF "PageID" numbers.

violating O.R.C. § 2929.04(A)(7), in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 9 and 16 of the Ohio Constitution.

2. There was insufficient evidence of aggravated robbery to support the conviction, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, Article I, §§ 9 and 16 of the Ohio Constitution, and Ohio Rev. Code Ann. §§ 2901.05(A), 2903.01(B), and 2929.04(A)(7) (Anderson 1996).

3. Appellant was denied his rights to a fair trial, to due process and to a reliable death sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when the State presented and the trial court admitted prejudicial "other acts" evidence.

4. State misconduct during the trial denied Mr. McNeill his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well Article I, §§ 2, 9, 10, and 16 of the Ohio Constitution.

5. The trial court violated Appellant McNeill's rights to the assistance of counsel and to due process as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when it denied Appellant's motion to dismiss trial counsel.

6. Appellant McNeill's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution was violated.

7. The trial court erred when it ruled that [redacted names] were competent to testify at the trial phase. This error violated Appellant McNeill's rights to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution, to due process under the Fifth and Fourteenth Amendments to the United States Constitution and to a reliable capital sentencing determination under the Eighth and Fourteenth Amendments to the United States Constitution.

8. The trial court erred when it death-qualified Appellant McNeill's jury. The death qualification of Appellant's jury violated his right to a fair and impartial sentencing jury as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Appellant's right to a reliable capital sentencing determination under the Eighth and Fourteenth Amendments to the United States

Constitution.

9.  The trial court erred to Appellant McNeill's prejudice because it removed for cause jurors with concerns about capital punishment under an incorrect standard. Appellant's right to due process under the Fourteenth Amendment to the United States Constitution was violated.

10. Mr. McNeill's death sentence is in violation of Ohio Rev. Code Ann. § 2929.05(A) (Anderson 1996), as well as the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Secs. 9 and 16 of the Ohio Constitution, in that aggravation does not outweigh mitigation and the death sentence is disproportionate.

11. Appellant McNeill's right against cruel and unusual punishment under the Eighth and Fourteenth Amendments and his right to due process under the Fifth and Fourteenth Amendments were violated by the trial court's erroneous review of this death sentence pursuant to Ohio Rev. Code Ann. § 2929.03(F) (Anderson 1993).

12. Ohio Rev. Code Ann. § 2929.03(D)(1) (Anderson 1993 & Supp. 1995) and Ohio Rev. Code Ann. § 2929.04 are unconstitutionally vague in violation of Appellant McNeill's right against cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

13. The definition of mitigating factors under Ohio Rev. Code Ann. § 2929.04(B)(7) (Anderson 1996) is misleading and results in unreliable capital sentencing in violation of the Eighth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 9 and 16 of the Ohio Constitution.

14. The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. O.R.C. Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed constitutional requirements and are unconstitutional, both on their face and as applied.

15. The trial court erred when it charged the jury on the statutory definition of reasonable doubt in Ohio Rev. Code Ann. § 2901.05 (Anderson 1993).

16.     The trial court erred when it denied Appellant McNeill's challenge to the jury panel on the ground of under representation of African-Americans in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

(*Id*. at 325-31 (capitalization altered and citations to trial transcript omitted).)  The State filed a responsive brief.  (*Id*. at 546-601.)

The appellate court affirmed McNeill's convictions and sentence on April 1, 1997. *State v. McNeill*, No. 95CA006158, 1997 WL 186348 (Ohio Ct. App. Apr. 1, 1997). McNeill, now represented by Attorneys Annette Powers and Renee Green, filed a timely notice of appeal to the Ohio Supreme Court.  (Doc. 116-1 at 668-69.)  In his brief, he presented the following seventeen propositions of law, stated as:

1.      Aggravated murder is not committed "while" the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated robbery, under R.C. 2903.10(B) and 2929.04(A)(7), when the two acts are not part of the same transaction.

2.      A conviction of the specification of having committed aggravated murder while committing or attempting aggravated robbery, R.C. 2929.04(A)(7), may not stand when as a matter of law, there is insufficient evidence to support it.

3.      It is prejudicial error to admit evidence of other criminal acts previously committed by the defendant to show the defendant acted in conformity therewith.

4.      Pronounced, persistent state misconduct which so infects the trial as to destroy its fundamental fairness amounts to a denial of due process and calls for a reversal.

5.      A motion to replace appointed counsel must be granted when there is a break down in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to the effective assistance of counsel.

6.      The defendant's right to the effective assistance of counsel is denied

when the defendant is prejudiced by counsel's deficient performance.

7.      It is an abuse of discretion and a violation of the United States Constitution to allow children under the age of ten to testify when they cannot receive accurate impressions of facts, recall facts known to them or appreciate their responsibility to tell the truth.

8.      The presumption of innocence is destroyed when prospective jurors are asked whether they could impose the death penalty upon this defendant.

9.      A prospective juror in a capital case is subject to a challenge for cause only if he or she is unequivocally opposed to capital punishment and if the juror refuses to consider capital punishment under any circumstances.

10.      A death sentence is disproportionate[ly] severe when given for a crime whose facts are far less heinous than those in similar cases where the death penalty was imposed.

11.      A capital defendant has a protected liberty interest in a reliable review of his death sentence by the trial court.

12.      R.C. 2929.03(D)(1) and R.C. 2929.04 are unconstitutionally vague in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

13.      R.C. 2929.04(B)(7) is unconstitutionally vague and may be understood by jurors as reasons for imposing the death penalty.

14.      Ohio's capital sentencing law is unconstitutional on its face and as applied to Appellant.

15.      The Due Process Clause is violated by a jury charge which permits a criminal conviction on proof of less than beyond a reasonable doubt.

16.      Substantially [*sic*] underrepresentation of African-Americans on a jury establishes a *prima facie* case of purposeful exclusion of African-Americans from the panel.

17.      Failure to charge the jury properly on a lesser included offense in a capital murder sentencing phase requires reversal of the death penalty.

(Doc. 116-2 at 68-70 (capitalization altered).) The Stated filed a responsive brief. (*Id*. at

310-61.)  The court affirmed the judgment of the appellate court on October 28, 1998.

*McNeill*, 83 Ohio St. 3d at 438.  McNeill moved for reconsideration, which the court

denied.  (Doc. 116-2 at 392-95.)

McNeill filed a petition for writ of *certiorari* in the United States Supreme Court.

(*Id*. at 408.)  The Court denied the petition on May 24, 1999.  (*Id*. at 410.)

### 3.        Application to Reopen Direct Appeal

Meanwhile, on June 30, 1997, McNeill, represented by David Bodiker, Laurence

Komp, and Jennifer Hite of the Office of the Ohio Public Defender, filed an application for

reopening pursuant to Ohio Appellate Rule 26(B).  (*Id*. at 4-17.)  Rule 26(B) permits

defendants to request to reopen the appeal from a judgment to present claims of ineffective

assistance of appellate counsel within ninety days from issuance of the court's direct-

appeal mandate, or later for "good cause."  *See* Ohio R. App. P. 26(B); *see also State v.*

*Murnahan,* 63 Ohio St. 3d 60 (Ohio 1992).  In his application, McNeill asserted that he

was denied the effective assistance of appellate counsel for failing to raise on direct appeal

the following assignments of error:

> 1.        The trial court erred in admitting the victim impact testimony of
>           Jeremiah Fulton during the mitigation phase of Appellant McNeill's
>           trial.
>
> 2.        Appellant McNeill's right to effective assistance of counsel was
>           violated during the voir dire stages of his trial.

(Doc. 116-2 at 5, 10 (capitalization altered).)  The State filed a brief in response.  (*Id*. at 18-

21.)  The appellate court denied the application on August 5, 1997.  (*Id*. at 26-27.)

McNeill filed a timely appeal of the appellate court's judgment in the Ohio Supreme

Court.  (Doc. 116-3 at 3-6.)  He presented three propositions of law, stated as:

1. An appellate court commits constitutional error when it refuses to consider whether an appellant had presented colorable appellate ineffectiveness claims because the court has an incomplete record before it and relies on an inapplicable App. R. in denying a request to ensure the consideration of the complete record.

2. The admission of the victim impact testimony during the mitigation phase of a capital trial prejudices a capital defendant's right to a fair determination of his sentence.

3. The performance of trial counsel falls below the level of competence contemplated by the Sixth Amendment where counsel failed to question jurors about their views on the death penalty.

(*Id*. at 22-24 (capitalization altered).)  The State filed a brief in response.  (*Id*. at 81-85.)

The Ohio Supreme Court affirmed the appellate court's judgment on October 28, 1998.  (*Id*. at 93-99.)  McNeill moved for reconsideration, which was denied.  (*Id*. at 101-10.)  McNeill then filed a petition for writ of *certiorari* in the United States Supreme Court, which also was denied, on June 14, 1999.  (*Id*. at 111.)

### 4. Post-Conviction Proceedings

Meanwhile, on September 20, 1996, McNeill, represented by David Bodiker, Laurence Komp, and Kevin Fahey of the Ohio Public Defender's Office, filed a petition for post-conviction relief with the trial court.  (*Id*. at 115-624.)  He asserted eighteen claims, stating:

1. Petitioner's convictions and/or sentences are void or voidable because death by electrocution constitutes a blatant disregard for the value of human life, entails unnecessary and wanton infliction of pain and diminishes the dignity of man.

2. Petitioner McNeill's conviction and/or sentences are void or voidable because the prosecutor suppressed material and exculpatory evidence, to wit:

   A. A statement of Robert Rushinsky which conflicts with

9

his trial testimony, Exhibit 12;

B. A description of the clothing worn by Mr. Fulton's assailant which indicates a second or another person was at the crime scene. Exhibit 13;

C. A tape recorded statement of Kimberly Sanford which was not disclosed to trial attorneys as required by Crim. R. 16. Exhibit 14.

3. Petitioner McNeill's conviction and/or sentences are void or voidable because the State of Ohio has interfered with McNeill's attempt to investigate and prepare his post-conviction petition. McNeill had requested all records maintained by the Lorain Police Department. Exhibit 15. The Lorain Police Department delivered documents which it relayed was the entire collection of materials it possessed on McNeill. Exhibits 16 and 17. McNeill has discovered other documents which refute this claim and show the claim to be patently false. Exhibits 12, 13 and 14.

4. Petitioner McNeill's conviction and/or sentences are void or voidable because trial counsel were deficient in their failure to investigate and present available mitigating evidence. More specifically, trial counsel failed to investigate and present testimony from his family and friends which details his family history, character and background. Exhibits 18-22. This should be read in the context that the defense presented only one (1) witness from McNeill's family.

5. Petitioner McNeill's conviction and/or sentences are void or voidable because the trial court erred in not sua sponte granting, and McNeill's counsel were ineffective in failing to move for, a mistrial after the stirring testimony of Jeremiah Fulton.

6. Petitioner McNeill's conviction and/or sentences are void or voidable because the death penalty is disproportionately meted out to those defendants who are racial minorities and/or those defendants who are accused of killing white victims.

7. Petitioner McNeill's conviction and/or sentences are void or voidable because death sentences in Ohio are racially biased against African-Americans.

8. Petitioner McNeill's conviction and/or sentences are void or voidable because the trial court failed to fully investigate and examine the

breakdown of the attorney[-]client relationship. In addition, trial counsel were ineffective in failing to disclose the extent of their problems with McNeill.

9. Petitioner McNeill's conviction and/or sentences are void or voidable because his trial attorneys were deficient in failing to obtain the services of competent clinical psychologists to rebut the improper arguments of the State.

10. Petitioner McNeill's conviction and/or sentences are void or voidable because his trial attorneys were deficient at the culpability and sentencing phases.

11. Petitioner McNeill's conviction and/or sentences are void or voidable because his trial attorneys were ineffective in requesting a pre-sentence report.

12. Petitioner McNeill's conviction and/or sentences are void or voidable because he was shackled at the sentencing hearing before the trial court judge.

13. Petitioner McNeill's conviction and/or sentences are void or voidable because the jury venire from which McNeill's jury was selected under-represented African-Americans and other minorities.

14. Petitioner McNeill's conviction and/or sentences are void or voidable because the investigator employed by McNeill's trial attorneys was drunk while performing the McNeill investigation. Exhibit 25. The investigator was also charged with a drunk driving offense prior to McNeill's trial. Exhibit 36.

15. Petitioner McNeill's conviction and/or sentences are void or voidable because trial counsel were deficient in their failure to investigate and present a defense. More specifically, trial counsel failed to investigate and present testimony from friends and family regarding McNeill's childhood and teen years.

16. The Ohio courts have not performed any meaningful proportionality review, instead the courts simply have failed to follow the spirit and intent of the statutory requirement.

17. Petitioner McNeill's conviction and/or sentences are void or voidable because the prosecutor instructed Robert Rushinsky not to talk with defense counsel prior to McNeill's trial.

18. Petitioner McNeill's conviction and/or sentences are void or voidable because the cumulative effects of the errors and omissions as presented in this petition . . . have been prejudicial to the petitioner and have denied the petitioner his rights as secured by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution.

(*Id*. at 118, 138, 139-40, 141, 142, 144, 145, 147, 148, 149, 150, 151, 152, 153, 154, 155, 158, 162, 163.)  The State opposed the petition.  (Doc. 116-4 at 67-117.)

On April 28, 1997, McNeill moved to amend his petition by adding a new eighteenth claim and making his original eighteenth claim a nineteenth claim.  (*Id*. at 145-50.)  The new eighteenth claim was stated as: "Petitioner McNeill's conviction and/or sentences are void or voidable because the trial court and the court of appeals failed to give effect to the mitigating factors presented by defense counsel during the sentencing proceedings of Mr. McNeill's trial." (*Id*. at 127.)  The State opposed the motion to amend.  (*Id*. at 151-53.)  The court denied the motion.  (*Id*. at 154.)  The trial court denied McNeill's petition for post-conviction relief on January 27, 1998.  (*Id*. at 155-62.)

McNeill filed a timely appeal of that judgment in the Ninth District Court of Appeals.  (*Id*. at 180-81.)  In his appellate brief regarding his post-conviction petition, McNeill raised the following eight (misnumbered) assignments of error, stated as:

1. The trial court erred in denying Appellant's post-conviction petition without considering the record in violation of the Eighth and Fourteenth Amendments to the United States Constitution, Art. I, §§ 2, 6, and 10, and Ohio Rev. Code § 2953.21.

2. The trial court erred in denying Appellant's second claim for relief in violation of the Fifth and Fourteenth Amendments to the United States Constitution, Art. I, § 10 of the Ohio Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963).

12

3.     The trial court erred in denying Appellant's motion for a definite statement in violation of the Eighth and Fourteenth Amendments to the United States Constitution, Art. I, §§ 2, 6, and 10, and Ohio Rev. Code § 2953.21.

4.     The ineffective assistance of counsel provided to Appellant violated his rights to a fair and impartial trial and sentence, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 5, 9, 10 and 16 of the Ohio Constitution.

5.     The trial court erred in denying Appellant's first, sixth, seventh, eighth, twelfth, thirteenth, sixteenth and seventeenth claims for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

6.     Ohio post-conviction procedures do not afford an adequate corrective process[,] nor do they comply with due process or equal protection under the Fourteenth Amendment.

12.     The trial court erred in applying the doctrine of res judicata to some of Appellant's claims in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments of the United States Constitution, Article I, §§ 1, 2, 9, 10, and 16 of the Ohio Constitution.

14.     The cumulative error of Appellant's substantive claims merit reversal or remand for a proper post-conviction process.

(Doc. 116-5 at 82, 83-84, 86, 89, 92-93, 103, 107, 108 (capitalization altered).) The State also filed a brief. (*Id*. at 198-256.)

While this appeal was pending, McNeill filed in the trial court a motion for relief from the judgment on his post-conviction petition pursuant to Ohio Civil Rule 60(b)(5). (Doc. 116-4 at 163-76.) The State opposed the motion. (*Id*. at 177-79.) The trial court denied it on August 17, 1998. (*Id*. at 184.) McNeill appealed that judgment as well to the Ninth District Court of Appeals. (*Id*. at 185-86.)

In his appellate brief regarding his motion for relief from judgment, McNeill

presented two assignments of error, stated as:

1.      The trial court erred in ruling upon Appellant's 60(B) motion because
        the trial court was divested of jurisdiction when Appellant filed a notice
        of appeal to this court from the denial of his post-conviction petition.

2.      The trial court erred in denying Appellant's 60(B) motion where
        Appellant established that the trial court failed to review the entire
        record when dismissing Appellant's post-conviction petition.

(Doc. 116-5 at 366.)  The State filed a responsive brief.  (*Id*. at 393-410.)

On September 23, 1999, the court of appeals ruled that the trial court lacked

jurisdiction to rule on McNeill's Rule 60(B) motion while his appeal of the denial of his

post-conviction petition was pending, and reversed its order denying the motion.  (*Id*. at

424-25.)

On March 8, 2000, the appellate court denied in part and affirmed in part the trial

court's judgment dismissing McNeill's post-conviction petition.  *State v. McNeill*, 137 Ohio

App. 3d 34 (Ohio Ct. App. 2000).  It held that the trial court could not rule on McNeill's

fourth and ninth claims that his trial counsel were ineffective in failing to present certain

mitigating evidence during the penalty phase while the trial record remained in the

possession of the Supreme Court in connection with his direct appeal, but that the remaining

claims were properly dismissed.  *Id*. at 42-43, 45.  The court therefore remanded the case to

the trial court on claims four and nine.  *Id*. at 43.

McNeill filed a timely appeal of the appellate court's judgment in the Ohio Supreme

Court.  (Doc. 116-6 at 159-61.)  In his memorandum in support of jurisdiction, he presented

the following propositions of law, stated as:

1.      The trial court erred in denying Appellant's post-conviction petition
        without considering the record in violation of the Eighth and Fourteenth

Amendments to the United States Constitution, Art. I, §§ 2, 6, and 10, and Ohio Rev. Code § 2953.21.

2. The trial court erred in denying Appellant's second claim for relief in violation of the Fifth and Fourteenth Amendments to the United States Constitution, Art. I, § 10 of the Ohio Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963).

3. The trial court erred in denying Appellant's motion for a definite statement in violation of the Eighth and Fourteenth Amendments to the United States Constitution, Art. I, §§ 2, 6, and 10, and Ohio Rev. Code § 2953.21.

4. The trial court erred in denying Appellant's tenth, eleventh, fourteenth, and fifteenth claims for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

5. The trial court erred in denying Appellant's fifth claim for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

6. The trial court erred in denying Appellant's third claim for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

7. The trial court erred in denying Appellant's eighth claim for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

8. The trial court erred in denying Appellant's seventeenth claim for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

9. The trial court erred in denying Appellant's sixth and seventh claims for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

10. The trial court erred in denying Appellant's thirteenth claim for relief in

violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

11. The trial court erred in denying Appellant's twelfth claim for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

12. The trial court erred in denying Appellant's first claim for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

13. The trial court erred in denying Appellant's sixteenth claim for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

14. The trial court erred in denying Appellant's eighteenth claim for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

15. Ohio post-conviction procedures do not afford an adequate corrective process[,] nor do they comply with due process or equal protection under the Fourteenth Amendment.

16. The trial court erred in denying Appellant an evidentiary hearing on all his claims for relief in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

17. The trial court erred in applying the doctrine of res judicata to some of Appellant's claims in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments of the United States Constitution, Article I, §§ 1, 2, 9, 10, and 16 of the Ohio Constitution.

18. The cumulative error of Appellant's substantive claims merit reversal or remand for a proper post-conviction process.

(*Id*. at 164-67 (capitalization altered).) The State filed a memorandum in opposition. (*Id*. at 237-63.) The court declined jurisdiction over the appeal on July 19, 2000. (*Id*. at 264.)

On February 6, 2001, the trial court again denied the remanded ineffective-assistance claims.  (Doc. 116-4 at 217-21.)

McNeill appealed the trial court's denial of his post-conviction claims four and nine. (Doc. 116-5 at 430-31.)  In his appellate brief, he presented the following assignment of error, stated as:

> The ineffective assistance of counsel provided to Appellant violated his rights to a fair and impartial trial and sentence, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 5, 9, 10 and 16 of the Ohio Constitution.

(*Id*. at 464.)  The State filed a responsive brief.  (*Id*. at 511-53.)  The court of appeals affirmed the trial court's judgment on August 22, 2001.  (*Id*. at 601-13.)

McNeill filed a timely notice of appeal in the Ohio Supreme Court.  (Doc. 116-7 at 3-6.)  In his memorandum in support of jurisdiction, he asserted the following proposition of law, stated as:

> The ineffective assistance of counsel provided to Appellant violated his rights to a fair and impartial trial and sentence, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 5, 9, 10 and 16 of the Ohio Constitution.

(*Id*. at 15.)  The State filed a memorandum in opposition.  (*Id*. at 52-96.)  The court declined jurisdiction on December 5, 2001.  (*Id*. at 97.)

Meanwhile, on January 25, 2001, McNeill, represented by Attorneys Bodiker and Hite, filed a motion in the trial court for an order declaring Ohio's post-conviction statute unconstitutional.  (Doc. 116-4 at 208-15.)  The court denied the motion on February 26, 2001.  (*Id*. at 226-27.)

McNeill appealed that judgment to the Ninth District Court of Appeals.  (Doc. 116-6

at 4-8.)  In his appellate brief, he asserted the following assignment of error:

> The trial court erred in its denial of Appellant's motion to declare Ohio's postconviction statute unconstitutional to a successor postconviction petition.

(*Id*. at 27.)  The State filed a responsive brief.  (*Id*. at 111-31.)  The appellate court affirmed the trial court's judgment on October 24, 2001.  (*Id*. at 153-57.)

### B.    Federal Habeas Corpus Proceedings

McNeill filed a notice of intent to initiate this habeas action on August 21, 2002. (Doc. 1.)  He requested appointment of counsel and permission to proceed *in forma pauperis*.  (Docs. 5, 15.)  This Court appointed Robert Dixon and Laurence Komp to represent him.  (Doc. 6.)

McNeill filed his original petition for writ of habeas corpus on December 4, 2002. (Doc. 21.)  Respondent filed the return of writ on February 3, 2003.  (Doc. 40.)  After requesting and receiving an extension of time, McNeill filed his traverse on July 1, 2003. (Doc. 50.)

That same day, McNeill moved for discovery and an evidentiary hearing.  (Doc. 51.) He requested permission to conduct depositions of eleven individuals and records depositions of five agencies to support his claims regarding his right to counsel of choice, ineffective assistance of counsel, jury composition, prosecutorial misconduct, suppression of exculpatory evidence, improper shackling, and improper admission of "other acts" evidence.  (*See id*. at 4.)  Respondent opposed the motion.  (Doc. 52.)  On April 15, 2005, this Court granted McNeill's request to develop his ineffective-assistance claims regarding counsel's mitigation investigation, request for a pre-sentence report and psychological evaluation, and preparation of certain mitigation witnesses, and denied the remaining

requests.  (Doc. 57.)

On April 14, 2006, McNeill filed a brief in support of his habeas petition; a renewed motion for discovery and/or evidentiary hearing regarding trial counsel's preparation of mitigation witnesses, the Lorain Police Department's (LPD) possession of a taped statement of a State witness and other records previously requested, and trial counsel's strategy in questioning venire members; and a motion for expansion of the record to include his affidavit regarding his relationship with trial counsel.  (Doc. 68.)  Respondent opposed the motions.  (Doc. 69.)  On May 25, 2007, the Court granted McNeill's requests to expand the record to include his affidavit and to conduct a records deposition of the LPD, and denied the remaining requests.  (Doc. 80 at 9-10.)

On March 14, 2008, McNeill's counsel advised the Court in a "Status Report Regarding Discovery" that the LPD had produced its file on the Fulton murder.  (Doc. 82 at 1.)  However, they explained, when counsel went to the LPD to compare the produced documents to the original records, they discovered eight audiotapes in the file that were not previously produced.  (*Id.*)  McNeill's counsel stated that the department "thereafter provided the undersigned counsel with copies of said tapes," and they were "reviewing them with . . . McNeill." (*Id.*)  Counsel further advised that they had told Respondent about the tapes and promised to provide her with copies.  (*Id.*)

On April 1, 2009, McNeill moved for funds to employ an investigator to further develop his claims that the LPD had suppressed exculpatory evidence because two of the audiotapes discovered in the LPD file were not disclosed to his trial counsel.  (Doc. 87.)  Respondent opposed the request.  (Doc. 88.)  On June 8, 2009, the Court granted it.  (Doc.

90.)

### C. State-Court Motion for New Trial and Motion to Stay Federal Habeas Proceedings and Hold in Abeyance

On September 23, 2011, McNeill filed with the state trial court a motion for leave to file a motion for new trial. (Doc. 118-1 at 10-27.) He sought to assert claims regarding the LPD's alleged suppression of exculpatory evidence based on the newly discovered audiotapes and LPD reports. (*Id*. at 15.)

On February 10, 2012, McNeill filed a motion asking this Court to stay his habeas action and hold it in abeyance pending the exhaustion of the claims raised in his state-court motion for a new trial. (Doc. 96.) Respondent opposed the motion. (Doc. 97.) The Court granted the motion on July 30, 2012. (Doc. 99.)

The state courts denied McNeill's motion for leave to file a motion for new trial. The trial court found the motion untimely, as McNeill did not adequately explain the reason for his delay in seeking the new trial; and, in the alternative, it found the claims lacked merit. (Doc. 118-1 at 227-32.) The state appellate court affirmed on timeliness grounds. (*Id*. at 358-65.) The Ohio Supreme Court declined jurisdiction of the appeal. (*Id*. at 458, 467.)

Having exhausted his remedies in state court, McNeill moved to reinstate his case on this Court's docket on August 24, 2017. (Doc. 107.)

### D. Reinstated Federal Habeas Proceedings

On March 2, 2018, McNeill filed a motion to amend his habeas petition (Doc. 120) and a motion to expand the record (Doc. 119). He sought to supplement his suppressed-evidence claim and add a new, related claim based on the three newly discovered

audiotapes, and McNeill moved to expand the record to include evidence that supports those claims. (Doc. 120 at 1; Doc. 119 at 1.) Respondent opposed both motions. (Docs. 121, 125.) On July 9, 2018, the Court granted McNeill's motions. (Doc. 128.)

McNeill filed an amended petition on September 6, 2018, . (Doc. 137.) Respondent filed a return of writ on November 13, 2018. (Doc. 141.) McNeill filed an amended traverse on February 1, 2019. (Doc. 144.) And Respondent filed a sur-reply on April 19, 2019. (Doc. 145.)

### PETITIONER'S GROUNDS FOR RELIEF

McNeill asserts twenty-seven grounds for relief in his amended petition, stated as:

1. The trial court violated Petitioner's rights to the assistance of counsel and due process guaranteed by the Sixth and Fourteenth Amendments when it denied Petitioner's motion to dismiss trial counsel.

2. Petitioner's counsel provided ineffective assistance at the mitigation phase in violation of the Sixth and Fourteenth Amendments.

3. The trial court failed to consider and give effect to mitigating evidence, thereby violating Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments.

4. The trial court erred when it denied Petitioner's challenge to the jury panel on the ground of underrepresentation of African-Americans in violation of the Sixth and Fourteenth Amendments.

5. The trial court erred when it ruled that [C.R.] and [R.G.] were competent to testify at the trial phase[,] thereby violating Petitioner's rights to a fair trial and to a reliable capital sentencing determination under the Sixth, Eighth and Fourteenth Amendments.

6. The State's instruction to Robert Rushinsky not to talk to defense counsel deprived Petitioner of his rights under the Fifth, Sixth and Fourteenth Amendments.

7. Petitioner Freddie McNeill's rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the State of Ohio failed to

provide the defense with exculpatory and favorable evidence. U.S. Const. Amends. V, VIII, XIV, *Brady v. Maryland*, 373 U.S. 83 (1963).

8. State misconduct during Petitioner's trial denied his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

9. The shackling of Petitioner at sentencing violated his Eighth and Fourteenth Amendment rights.

10. The trial court improperly death-qualified Petitioner's jury when it asked prospective jurors whether they could sentence Petitioner to death, thereby violating Petitioner's rights to a fair and impartial sentencing jury and a reliable capital sentencing determination under the Sixth, Eighth and Fourteenth Amendments.

11. Petitioner's jury could not consider and give effect to mitigating evidence due to an improper instruction requiring the acquittal first of the death penalty prior to the consideration of the life options in violation of the Sixth, Eighth and Fourteenth Amendments.

12. The definition of mitigating factors under O.R.C. § 2929.04(B)(1) is misleading and results in unreliable capital sentencing in violation of the Eighth and Fourteenth Amendments.

13. The aggravated murder provision O.R.C. § 2903.01(B) and the death penalty specification provision O.R.C. § 2929.04(A)(7), as applied in Petitioner's case violate the Eighth and Fourteenth Amendments.

14. There was insufficient evidence of aggravated robbery to support Petitioner's convictions under O.R.C. §§ 2901.05(A), 2903.01(B), and 2929.04(A)(7)[,] thereby violating the Eighth and Fourteenth Amendments.

15. Petitioner was denied his rights to a fair trial, to due process and to a reliable death sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth [Amendments] when the State presented and the trial court admitted prejudicial "other acts" evidence.

16. Petitioner's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments was violated.

17. The trial court applied an incorrect standard when it removed for cause jurors with concerns about capital punishment[,] thereby violating Petitioner's right to due process under the Fourteenth Amendment.

18.    Petitioner's death sentence violates the Eighth and Fourteenth Amendments in that the aggravation does not sufficiently outweigh the mitigation.

19.    O.R.C. § 2929.03(D)(1) and O.R.C. § 2929.04 are vague in violation of Petitioner's right against cruel and unusual punishment under the Eighth and Fourteenth Amendments.

20.    The Fifth, Sixth, Eighth and Fourteenth Amendments establish the requirements for a valid death penalty scheme. O.R.C. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05. Ohio's statutory provisions governing the imposition of the death penalty[] do not meet the prescribed constitutional requirements and are unconstitutional, both on their face and as applied.

21.    The trial court's reasonable doubt instruction failed to comport with the requirements of the Fourteenth Amendment.

22.    The death penalty in Ohio is applied in a racially discriminatory manner in violation of the Eighth and Fourteenth Amendments.

23.    Ohio's proportionality review violates due process.

24.    The introduction of victim impact evidence at Petitioner's mitigation phase violated his rights under the Eighth and Fourteenth Amendments.

25.    Ohio's procedure for raising ineffective assistance of appellate counsel violates the Fifth, Sixth, Eighth and Fourteenth Amendments.

26.    Cumulative effect of error in Petitioner's case deprived Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

27.    The judgments and sentences against Freddie McNeill are constitutionally invalid because the Lorain County Prosecutor's Office failed to provide trial counsel with exculpatory evidence and intentionally created a materially false impression at trial. McNeill's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated.

(Doc. 137 at 2-5 (capitalization altered).)

In his amended traverse, McNeill notes that he has "abandon[ed] any claims that

relate solely to his death sentence" – namely, grounds two, three, nine, ten, eleven, twelve, seventeen, eighteen, nineteen, twenty, twenty-one, twenty-two, twenty-three, and twenty-four.  (Doc. 144 at 22, 23, 94-97, 123-130.)  In addition, McNeill concedes that his twenty-fifth ground for relief, challenging Ohio's post-conviction process, is not a cognizable ground for habeas corpus relief, and he has abandoned that claim as well.  (*Id*. at 131.)  He states that he reserves the right to seek the overruling of the Sixth Circuit Court of Appeals precedent regarding that issue on appeal, however.  (*Id*.)

<h2 style="text-align:center">STANDARDS OF REVIEW</h2>

### A.      AEDPA Review

McNeill's petition for writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (AEDPA governs federal habeas petitions filed after Act's effective date).  AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'"  *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  The Act "recognizes a foundational principle of our federal system:  State courts are adequate forums for the vindication of federal rights."  *Burt v. Titlow*, 571 U.S. 12, 18 (2013).  It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  *Id*. at 19.

One of AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in § 2254(d).  That provision forbids a federal court

from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original). A state court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [Supreme Court] decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citations omitted). The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court

precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18; *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[3] The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would

---

[3] Section 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

have reached a different conclusion in the first instance.'" *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen,* 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Harrington,* 562 U.S. at 102-03 (internal quotation marks omitted). A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not

by definition preclude relief." *Miller-El*, 537 U.S. at 340.  Rather, "under AEDPA standards, a federal court can disagree with a state court's factual determination and 'conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.'" *Baird v. Davis*, 388 F.3d 1110, 1123 (7th Cir. 2004) (quoting *Miller-El*, 537 U.S. at 340) (Posner, J.)).  Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits.  *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).  They likewise may review *de novo* claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions.  *See, e.g., Wiggins,* 539 U.S. at 534 (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong).

### B.	Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus.  28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982).  This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).

It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). It occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806.

Where a state court declines to address a prisoner's federal claim because the prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732-33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).[4]

---

[4] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established the now familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule. It is:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the

A petitioner also may procedurally default a claim by failing to raise the claim in state court and pursue it through the state's "'ordinary appellate review procedures,'" if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both

_____

state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'" *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, the federal court again looks to the last state court rendering a reasoned opinion on that claim. *Ylst*, 501 U.S. at 805. If the state court "clearly and expressly states that its judgment rests on a state procedural bar," then the claim is procedurally defaulted.[5] *Harris v. Reed*, 489 U.S. 255, 263 (1989). Conversely, if the last state court presented with the claim reaches its merits, then the procedural bar is removed and the federal habeas court may consider the merits of the claim in its review. *Ylst*, 501 U.S. at 801.

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id*. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir.

---

[5] Where a later state-court decision rests upon a prohibition against *further* state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ." *Ylst*, 501 U.S. at 804 n.3. In that case, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Id*. at 805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no bearing upon [a petitioner's] ability to raise the [federal] claim in federal court").

1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

A fundamental miscarriage of justice in capital cases also means actually innocent of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992). In this sense, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law." *Id.* at 336. This "actual innocence" standard "must focus on the elements that render a defendant eligible for the death penalty." *Hutton v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (citing *Sawyer*, 505 U.S. at 347).

### C. Cognizability

To the extent a claim asserted in a federal habeas petition alleges state-law violations, it is not cognizable on federal habeas review and should be dismissed on that basis. "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id.* (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

## DISCUSSION

### A.  First Ground for Relief: *Assistance of Counsel*

In his first ground for relief, McNeill claims that the trial court violated his constitutional rights to effective assistance of counsel and due process when it denied his request during trial to dismiss his appointed counsel and appoint new counsel. (*See* Doc. 144 at 10-21.) He alleges that if the court had properly investigated the situation, it would have discovered that the breakdown of his relationship with his attorneys was so severe that it had resulted in a conflict of interest adversely affecting their performance and a constructive denial of counsel. (*Id.* at 11-14.)

33

### 1.    Procedural Posture

McNeill presented this claim on direct appeal to state courts.  (*See* Doc. 116-2 at 116-20.)  In his brief to the Ohio Supreme Court, he stated as a proposition of law:  "A motion to replace appointed counsel must be granted when there is a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to the effective assistance of counsel."  (*Id*. at 116.)  Ohio's high court rejected the claim on its merits.  *See McNeill*, 83 Ohio St. 3d at 451-52.

McNeill also raised this claim in state courts on post-conviction review.  (*See* Doc. 116-3 at 147-48.)  He submitted as support a Lorain County Sheriff's Department incident report, in which an officer who transported McNeill from prison to the court house described an argument between McNeill and his trial counsel during a conference that escalated to the point where the officer had to intervene to prevent McNeill from assaulting his attorney.  (*Id*. at 584 (Incident Report).)  McNeill also included a related claim of ineffective assistance of counsel for having failed to inform the trial court of the severity of their problems with McNeill, including the altercation at issue in the report.  (*See* Doc. 116-3 at 147; Doc. 116-5 at 95.)

The trial court rejected McNeill's post-conviction right-to-counsel claim and related ineffective-assistance claim based on Ohio's *res judicata* doctrine, because the right-to-counsel claim was raised on direct appeal by new counsel and the incident report did not "substantially enhance" the claim, and the ineffective-assistance-of-counsel claim could have been raised on direct appeal.  (Doc. 116-4 at 159.)  *See State v. Perry*, 10 Ohio St. 2d 175, 180 (Ohio 1967) (holding Ohio's *res judicata* rule precludes a defendant from raising

for the first time in post-conviction proceedings a claim that was fully litigated or could have been fully litigated at trial or on direct appeal.); *State v. Cole*, 2 Ohio St. 3d 112, 114 (Ohio 1982) (noting the *res judicata* bar can be overcome by the introduction of competent and cogent evidence *dehors* the record).

The court of appeals affirmed the trial court's judgment. *McNeill*, 137 Ohio App. 3d at 41. It first explained that, generally, defendants seeking post-conviction relief must "provid[e] evidence of sufficient operative facts to demonstrate a cognizable claim of a constitutional error" and are barred by *res judicata* unless the claims are based on cogent evidence *de hors* the record. *Id*. at 40. And it generally concluded that the extra-record evidence McNeill submitted with his post-conviction petition "was not sufficient to defeat the *res judicata* bar." *Id.* With regard to McNeill's right-to-counsel and related ineffective-assistance claims specifically, it found the evidence submitted "failed to even support his allegations" and the claims were "unsubstantiated." *Id*. at 41. It explained,

> [McNeill's] evidence merely referred to isolated incidents of conduct, but failed to even suggest that these incidents impacted trial counsel's performance, or the effectiveness of his defense, in any way. His eighth claim was that his trial counsel was ineffective for failing to disclose that the attorney-client relationship had broken down. McNeill's evidence indicated that there had been a physical altercation between McNeill and one of his trial counsel. This evidence of one incident between the two falls far short of demonstrating that there had been a complete breakdown in the attorney-client relationship.

*Id.* The Ohio Supreme Court declined jurisdiction. (Doc. 116-5 at 619.)

McNeill asserts that the state appellate court on post-conviction "appears to have rejected [the claim] on the merits," or at best was "ambiguous" on the issue. (Doc. 144 at 17.) State courts invoking a state procedural bar to a federal constitutional claim must provide a "clear and express" statement to that effect or the bar will not preclude federal

35

habeas review of the claim. *Gulertekin v. Tinnelman-Cooper,* 340 F.3d 415, 422-23 (6th Cir. 2003) (citing *Michigan v. Long,* 463 U.S. 1032 (1983) (establishing the "plain statement rule"), and *Harris v. Reed*, 489 U.S. 255 (1989) (applying the rule in the federal habeas context)). For this presumption to apply, however, "the decision of the last state court to which the petitioner presented his federal claims must fairly appear to rest primarily on federal law or to be interwoven with federal law." *Id.* (quoting *Coleman v. Thompson,* 501 U.S. 722, 735 (1991)). It is true that the state appellate court here did not expressly state that it was asserting the *res judicata* bar to preclude review of these particular claims. But the court did not refer or cite to any federal law in its analysis of the claims. Nor did its analysis of the claims extend beyond the question of whether the incident report supported them to their broader merits. The state appellate court, therefore, invoked the *res judicata* rule barring its review of these claims on post-conviction.

The claims, however, are not procedurally defaulted. McNeill states that Respondent has asserted that "the aspects of [his] claim that were raised in his state post-conviction proceedings" are procedurally defaulted. (Doc. 144 at 17.) But Respondent does not assert a procedural-default defense to McNeill's right-to-counsel claim. (*See* Doc. 145 at 16.) Rather, she correctly recognizes that a state court's application of the *res judicata* rule will not result in a claim's procedural default when it rests only upon a prohibition against *further* state review. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 n.3. (1991). In that case, habeas courts "look through" the later decision to the prior reasoned state-court judgment. *Id*. at 805. Here, the state appellate court asserted the *res judicata* bar because McNeill raised the right-to-counsel claim on direct appeal and the evidence he submitted on

post-conviction was insufficient to overcome that bar. *McNeill*, 137 Ohio App. 3d at 41. This Court, therefore, will look through that decision to the Ohio Supreme Court's decision on direct appeal, in which the court fully considered the merits of the claim.

McNeill's related post-conviction ineffective-assistance claim, on the other hand, would be procedurally defaulted. He did not raise that claim on direct appeal, so, as the trial court explained, *res judicata* applies because it could have been raised on direct appeal but was not. (*See* Doc. 116-4 at 159.) It does not appear, however, that McNeill asserts that claim here as an independent ineffective-assistance claim. He presents no legal argument supporting that claim in his traverse. Instead, he refers to counsel's ineffective performance, including their failure to inform the trial court about the serious nature of the problems in their relationship with McNeill, as factual support for his right-to-counsel claim. (*See, e.g.*, Doc. 144 at 13 ("The complete breakdown in the attorney-client relationship, and trial counsel's failure to disclose the physical altercation to the trial court at McNeill's *pro se* motion hearing, constructively amounted to a complete breakdown of the adversarial process.").)[6]

For her part, Respondent argues that McNeill's conflict-of-interest claim under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), is procedurally defaulted and/or unexhausted because McNeill did not raise it "properly" in state court and may no longer do so. (Doc. 145 at 14.)[7] McNeill counters that he presented the claim to the Ohio Supreme Court on

---

[6] Because McNeill's right-to-counsel claim is not procedurally defaulted, McNeill's arguments that the bar was misapplied (Doc. 144 at 17-18) and he is actually innocent (*id*. at 18-21) are moot.

[7] Respondent also asserts that McNeill "improperly raises" his "'conflict of interest claim'" under *Cuyler* and *Cronic* because he raised it for the first time in his traverse. (Doc. 145 at 13.)

37

direct appeal.  (Doc. 144 at 11-12.)  The Court agrees.

As noted above, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a petition for a writ of habeas corpus.  28 U.S.C. § 2254(b), (c); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts."  *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987).  A petitioner fairly presents the substance of his federal constitutional claim to the state courts by:  (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law.  *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004).

Determining when a claim has been "fairly presented" because of variations in legal theory or factual allegations "is contextual and individual to each case."  *Houston v. Waller*, 420 Fed. Appx. 501, 509 (6th Cir. 2011).  "In some instances, simply presenting the facts, without also presenting 'the constitutional claim . . . inherent in those facts' is insufficient . . . .  In others, however, 'the ultimate question for disposition will be the same despite variations in the legal theory or factual allegations urged in its support.'"  *Id*. (quoting *Picard v. Connor*, 404 U.S. 270, 277 (1971) (internal quotations and citations omitted)); *see also Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir. 2008) ("To present a claim fairly, it is

---

As McNeill responds, however, his petition complies with the court rules governing § 2254 petitions by setting forth the ground for relief and factual basis of this claim (*see* Doc. 137 at 35); the rules do not require that petitioners cite legal authority in the petition.  *See* Rule 2(c), (d) of the Rules Governing Section 2254 Cases; AO Form 241, Instructions, ¶ 5.

sufficient if the substance of the claim was presented to the state courts, such that the ultimate question would have been the same despite variations in the legal theory or factual allegations urged in its support.").

McNeill presented the substance of his conflict-of-interest claim in his merits brief on direct appeal to the Ohio Supreme Court. He set forth the claim's factual premise, arguing that his "[a]ppointed counsel rendered ineffective assistance as the result of a conflict between their pecuniary interests and the interests of their client." (Doc. 116-2 at 119.) And he relied on a federal case for his assertion that prejudice must therefore be presumed, *Strickland v. Washington*, 466 U.S. 668, 692 (1984), in which the Supreme Court discussed *Cuyler v. Sullivan* at length, affirming its holding that prejudice is presumed where there is an actual conflict of interest between an attorney and client that adversely affected the attorney's performance. (Doc. 116-2 at 119.) This claim, therefore, was fairly presented to state courts and also is ripe for habeas review.

### 2.  Merits Analysis

In rejecting McNeill's right-to-counsel claim, the Ohio Supreme Court reasoned:

In his fifth proposition of law, McNeill claims the trial court erred in refusing to replace his court-appointed counsel because there was "'a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel.'" *State v. Coleman* (1988), 37 Ohio St.3d 286, 292, 525 N.E.2d 792, 798–799, quoting *People v. Robles* (1970), 2 Cal.3d 205, 215, 85 Cal.Rptr. 166, 173, 466 P.2d 710, 717. There is no constitutional right to a "meaningful attorney-client relationship." *Morris v. Slappy* (1983), 461 U.S. 1, 13–14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610, 621. There is only a right to professionally competent, effective representation.

McNeill submitted to the trial judge his motion to replace counsel after the jury was impaneled and immediately before opening statements were to begin. He claimed his attorneys communicated with him only once following their appointment, and refused to obtain information for him or to place two

39

requested witnesses on the witness list.

Defense counsel stated they met with McNeill between one and two dozen times, spoke with him on the phone, and gave him copies of all discovery. Also, counsel in fact listed one of the two witnesses McNeill wanted, and stated that McNeill withdrew his request for the other.

The trial court found that, given the timing, McNeill's motion was made for the purpose of delay. Furthermore, notwithstanding several previous opportunities, McNeill did not bring the alleged problem to the court's attention until immediately before opening statements.

It was within the trial court's discretion to decline to replace appointed counsel. *See State v. Downs* (1977), 51 Ohio St.2d 47, 61–62, 5 O.O.3d 30, 38, 364 N.E.2d 1140, 1149, sentence vacated on other grounds, *Downs v. Ohio* (1978), 438 U.S. 909, 98 S.Ct. 3133, 57 L.Ed.2d 1153. McNeill's factual claims were disputed, and the timing of his motion made it reasonable to conclude his purpose was delay. Finding no abuse of discretion by the trial court, we overrule McNeill's fifth proposition of law.

*McNeill*, 83 Ohio St. 3d at 451-52.

The Sixth Amendment guarantees a criminal defendant "the Assistance of Counsel for his defense." U.S. CONST. amend. VI. The Supreme Court has long recognized that an accused's right to be represented by counsel is a "fundamental component of our criminal justice system." *U.S. v. Cronic*, 466 U.S. 648, 653 (1984). And over time, the Court has established a broad array of protections flowing from that right. *See, e.g., Gideon v. Wainwright*, 372 U.S. 335, (1963) (indigent defendant's right to appointed counsel); *Wheat v. United States*, 486 U.S. 153 (1988) (right to counsel of choice); *Cuyler v. Sullivan*, 446 U.S. 335 (1980) (right to conflict-free representation). Foremost among them is the effective assistance of counsel, as an accused will receive a fair trial only where "the prosecution's case . . . survive[s] the crucible of meaningful adversarial testing." *Cronic*, 466 U.S. at 656.

McNeill argues that the Ohio Supreme Court's decision was contrary to this clearly established Supreme Court precedent under § 2254(d)(1) because the state court did not apply the correct legal standards to his claim. (Doc. 144 at 11-14, 15-16.) He first argues that the Ohio Supreme Court should have applied *Cuyler v. Sullivan*. (Doc. 144 at 15-16.) In that case, the Supreme Court held that an attorney's representation of more than one defendant in a criminal matter violates the Sixth Amendment if the multiple representation creates an actual conflict of interest that adversely affects the lawyer's performance. *Sullivan,* 446 U.S. at 350. McNeill contends that *Sullivan* required the Ohio Supreme Court to examine whether the breakdown of his relationship with his trial counsel was so severe that it resulted in his attorneys having a conflict of interest adversely affecting their performance. (Doc. 144 at 15-16.) Furthermore, he argues, his counsel should have acknowledged to the trial court that the their relationship with McNeill had deteriorated to the point they could no longer represent him and moved to withdraw from the case. (*Id*. at 11-12.) But instead, they "allowed their own pecuniary interest in staying on the case to outweigh their duty of loyalty to their client." (*Id*. at 12.)

The Supreme Court has not clearly established, however, that *Sullivan* applies to the type of conflict McNeill alleges here – a disagreement or contentious relationship between an attorney and his or her client. As the Sixth Circuit recently explained:

> This Court has observed that "[i]n *Mickens v. Taylor*, [535 U.S. 162 (2002),] the Supreme Court found that the presumed standard of *Sullivan* was clearly established only in the situation of a conflict of interest due to multiple concurrent representation," and therefore "has consistently held that, for § 2254 cases, the *Sullivan* standard does not apply to claims of conflict of interest other than multiple concurrent representation . . . ."

*Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 844 (6th Cir. 2017) (quoting

*Stewart v. Wolfenbarger*, 468 F.3d 338, 350–51 (6th Cir. 2006) (collecting cases)). McNeill acknowledges the Sixth Circuit's position limiting *Sullivan* to multiple concurrent representation, but he argues it is "debatable" since the Fourth Circuit has applied *Sullivan* to other contexts. (Doc. 144 at 12-13 (citing *Rubin v. Gee*, 292 F.3d 396, 402 n.2 (4th Cir. 2002)).) Clearly established federal law for purposes of § 2254(d)(1), however, includes only Supreme Court holdings. *E.g., White v. Woodall*, 572 U.S. 415, 419 (2014).

*Sullivan*, therefore, is not the clearly established federal law governing McNeill's right-to-counsel claim. *See Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (reversing grant of habeas relief because no Supreme Court decision had "squarely address[ed]" the issue or "clearly establish[ed]" that law developed in a different context applied to the facts of that case); *Pouncy v. Palmer,* 846 F.3d 144, 161 (6th Cir. 2017) ("In conducting the 'clearly established' inquiry, lower courts must narrowly construe Supreme Court precedents and, as a consequence, 'clearly established' law 'consist[s] only of something akin to on-point holdings.'") (quoting *House*, 527 F.3d at 1015).

McNeill also argues that the Ohio Supreme Court should have applied *United States v. Cronic*, 466 U.S. 648 (1984), to his right-to-counsel claim. (Doc. 144 at 13-14.) In *Cronic*, the Supreme Court held that "[c]ircumstances of . . . magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659-60. It provided three examples of such circumstances: the "'complete denial of counsel,'" in which the accused is denied the presence of counsel at "'a

critical stage'"; when counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing'"; and when counsel is placed in circumstances in which competent counsel very likely could not render assistance. *Bell v. Cone*, 535 U.S. 685, 695-96 (2002) (quoting *Cronic*, 466 U.S. at 659-62). But in that case, the Court held that the defendant's claim that his counsel's lack of experience and short time for preparation did not warrant a presumption of prejudice. *Cronic*, 466 U.S. at 663–66.

McNeill argues that the Ohio Supreme Court should have applied *Cronic* to his claim and evaluated whether the breakdown in his relationship with appointed counsel was so severe that it "amounted to the functional equivalent of a complete denial of counsel at a critical stage of the proceedings." (Doc. 144 at 12-14.) The Supreme Court, however, repeatedly has refused to find *Cronic* the clearly established law governing habeas ineffective-assistance claims outside the parameters of its specific holding. *See Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015) (per curiam) (finding state-court decision was not "contrary to" *Cronic* under § 2254(d)(1) where "none of [its] holdings address counsel's absence during testimony that is irrelevant within the defendant's own theory of the case"); *Van Patten*, 552 U.S. at 124 (holding that no Supreme Court precedent clearly established that counsel's participation by speaker phone should be treated as a "complete denial of counsel," on par with total absence, under *Cronic*); *Bell*, 535 U.S. at 696 (declining to presume prejudice under *Cronic* where a capital defendant's counsel "failed to 'mount some case for life' after the prosecution introduced evidence in the sentencing hearing and gave a closing statement").

Indeed, the Court expressly rejected claims such as McNeill's in *Cronic* itself. It emphasized in *Cronic* that the Sixth Amendment's guarantee of effective assistance of

counsel serves to protect the fairness of the adversarial process. *Cronic*, 466 U.S. at 655-57. For that reason, it noted, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance." *Id*. at 657 n.21. The Court cited for that proposition *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983), which held that there is no constitutional right to a "meaningful attorney-client relationship." The *Cronic* Court also cited *Slappy* for the proposition that "with respect to a trial court's refusal to grant the defense additional time to prepare for trial . . . great deference must be shown to trial courts, because of the scheduling problems they face." *Cronic*, 466 U.S. at 662 n.31.

And it was *Slappy* that the Ohio Supreme Court relied on in rejecting McNeill's right-to-counsel claim, *see McNeill*, 83 Ohio St. 3d at 452, which was entirely reasonable for it to do, as that decision "squarely address[ed]" the issue presented here. *Van Patten*, 552 U.S. at 125. In *Slappy*, the defendant's original appointed counsel became ill, and the trial court appointed a new attorney to represent him six days before trial. *Slappy,* 461 U.S. at 5. After the trial was already underway, the defendant moved *pro se* several times for a continuance to give his new attorney more time to prepare or to allow his original attorney to return. *Id.* at 5-9. The Court held that the trial court did not abuse its discretion or deny the defendant's right to counsel when it denied the defendant's requests. *Id*. at 12. The Court noted that "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. . . . Trial judges necessarily require a great deal of latitude in scheduling trials." *Id*. at 11. The Court stressed that the defendant's attorney unequivocally

44

assured the court that he was fully prepared for trial. *Id*. at 12. And it found the trial court could reasonably have concluded that the defendant's later requests to be represented by his original counsel were a "transparent ploy for delay," where before then he had only sought additional preparation time and expressed satisfaction with his counsel. *Id*. at 13. The Court vigorously rejected the lower court's recognition of a Sixth Amendment right to a "meaningful attorney-client relationship," observing: "No court could possibly guarantee that a defendant will develop the kind of rapport with his attorney – privately retained or provided by the public – that the Court of Appeals thought part of the Sixth Amendment guarantee of counsel." *Id*. at 13-14.

Moreover, the Ohio Supreme Court reasonably applied *Slappy* in affirming the trial court's denial of McNeill's requests. The trial court first noted that the timing of McNeill's motion suggested it was done to delay the proceedings, given that McNeill waited until the trial was about to begin to make his requests even though the court had provided McNeill with opportunities at least twice to speak directly to the court on the record with his attorney and the prosecutor present and he did not mention this issue. (Doc. 117-4 (Trial Tr.) at 26-27.) The court cited counsel's depth of experience in trying capital cases and "exceptional[]" performance in prior cases before it. (*Id*. at 27.) It found they had "vigorously represented" McNeill and would continue to do so. (*Id*.) As in *Slappy*, counsel assured the trial court that they were fully prepared for trial and that they had communicated and worked with McNeill numerous times. (*Id*. at 22-26.) Finally, the court rejected McNeill's arguments that counsel had not carried out his suggestions about witnesses or other discovery matters. (*Id*. at 27-28.)

McNeill argues that the Ohio Supreme Court's finding that his request for new

counsel was made for purposes of delay was an unreasonable determination of fact under § 2254(d)(2). (Doc. 144 at 15.) He contends that he identified for the court many "legitimate" reasons why he needed new counsel, and any delay caused by the substitution of counsel would have been "completely incidental to his primary purpose, which was to ensure that he would be afforded . . . competent representation . . . ." (*Id.*) As the state court noted, McNeill voiced three complaints about his counsel to the trial court. In a *pro se* motion he had his counsel submit to the trial court, he stated that he had "talked with council [*sic*] only once" since they were appointed. (Doc. 116-2 at 210 (Motion to Dismiss Counsel).) At the hearing on his motion the trial court conducted after receiving the motion, McNeill explained to the court that he wanted two individuals to testify on his behalf, but his counsel ignored that request. (Doc. 117-4 (Trial Tr.) at 21.) And he told the court that he had asked his attorneys for background information on State witnesses, docket sheets, and "all that," but he "never got any of that" and "felt like [he was] about to be railroaded . . . with no defense." (*Id*. at 22.)

McNeill's attorneys disputed the allegations, telling the court they had met with McNeill personally and conferred with him over the telephone dozens of times; supplied him with copies of all discovery and important pleadings; and that McNeill withdrew one of the names of possible witnesses he supplied to them. (*Id*. at 22-24.) They also stressed their strong experience in representing capital defendants and thorough preparation for trial. (*Id*. at 24-36.)

Based on this record, the Ohio Supreme Court reasonably concluded that "the timing of [McNeill's] motion made it reasonable [for the trial court] to conclude his purpose was delay." *McNeill*, 83 Ohio St. 3d at 452. And McNeill offers only conclusory assertions

challenging the reasonableness of that determination. He offers no additional evidence overlooked by the state court.[8] He therefore has not met his burden of presenting clear and convincing evidence to rebut the state court's findings. *Burt v. Titlow*, 571 U.S. 12, 18 (2013).

Accordingly, the Ohio Supreme Court decision rejecting McNeill's right-to-counsel claim was not based on an unreasonable determination of fact, and was neither contrary to, nor an unreasonable application of, clearly established federal law.

**B.      Fourth Ground for Relief:  *Jury Composition***

In his fourth ground for relief, McNeill argues that African–Americans were underrepresented in the pool from which his jury was selected, violating his Sixth Amendment right to be tried by a jury selected from a fair cross-section of the community and his Fourteenth Amendment right to equal protection. (*See* Doc. 144 at 24-35.)

**1.      Procedural Posture**

McNeill asserted this claim in state courts on direct appeal, where it was adjudicated on the merits. *See McNeill*, 83 Ohio St. 3d at 443-44. He also raised this claim on post-conviction review. (Doc. 116-3 at 152-53.) He submitted in support of the claim an expert

---

[8] McNeill repeatedly points to the incident report of the altercation between McNeill and his lawyer as evidence of the breakdown in his relationship with his attorneys. (*See, e.g.*, Doc. 144 at 11, 13 (citing Doc. 116-3 at 584 (Incident Report)).) But this Court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Similarly, his allegations that counsel should have disclosed this altercation to the trial court or other information about their relationship with McNeill (Doc. 144 at 11-12), or that they should have moved to withdraw from the case (*id.* at 12) have no bearing on the reasonableness of the trial court's determination, as those things never happened.

report in which the expert concluded that "Lorain County non-White and Hispanic residents were seriously underrepresented in the April 10, 1995 jury panel." (Doc. 146-1 (Wiley Aff) at 1-2. ) But she acknowledged that the information she relied upon was "not a large enough sample from which to draw the conclusion that there is systematic underrepresentation" or whether "underrepesentation is a statistically significant occurrence . . . ." (*Id*. at 4.)

The state appellate court found the submitted affidavit insufficient to overcome the *res judicata* bar because, although the evidence was "arguably relevant," McNeill did not establish that the claim could not have been raised at trial or on direct appeal without that evidence, or even if necessary to support the claims, that he was prevented from obtaining and presenting it at trial. *McNeill*, 137 Ohio App. 3d at 42.

Again, McNeill states that Respondent asserts a procedural-default defense to this claim. (Doc. 144 at 3135.) As explained with regard to McNeill's first ground for relief, Respondent does not argue that this claim is procedurally defaulted. McNeill presented this claim on direct appeal in state courts, and the Ohio Supreme Court adjudicated it on the merits. The state appellate court on post-conviction review invoked the *res judicata* bar only to decline further review of the claim. And a later state-court decision that rests upon a prohibition against *further* state review does not result in a procedural default; habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Ylst*, 501 U.S.

at 804 n.3. This claim is therefore preserved for federal habeas review.[9] [10]

### 2. Merits Analysis

#### a. fair cross-section

As to McNeill's fair-cross-section challenge, the Ohio Supreme Court opined:

In his sixteenth proposition of law, McNeill contends underrepresentation of African–Americans on the jury venire violated both the Sixth Amendment right to be tried by a jury representing a fair cross-section of the community, and the Fourteenth Amendment equal protection guarantee.

McNeill first raised this issue during voir dire. After the jury was impaneled, McNeill renewed his objection, claiming underrepresentation because only two of the forty-seven persons questioned were African–American. The trial judge overruled McNeill's objection, finding "no evidence of systematic exclusion [and] no evidence that the group is not a fair and reasonable relation to the number of such persons in the community." Moreover, defense counsel admitted he could not show "systematic exclusion" of any group from the venire.

The Sixth Amendment guarantee to a jury trial "contemplates a jury drawn from a fair cross section of the community." *Taylor v. Louisiana* (1975), 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690, 696. To establish a violation of this requirement, the "defendant must prove: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process." *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, paragraph two of the syllabus, citing *Duren v. Missouri* (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586–587.

Other than his personal observations and those of defense counsel that the venire appeared imbalanced, McNeill failed to produce evidence demonstrating that African–Americans were underrepresented on the venire in relation to their

---

[9] For the same reason, the Court rejects McNeill's argument that because the state appellate post-conviction court did not adjudicate his fair-cross-section claim on the merits, AEDPA does not preclude relief on the claim "at least to the extent it was raised in [his] post-conviction proceedings." (Doc. 144 at 31.)

[10] McNeill's arguments that the procedural bar was misapplied or "exorbitant" (Doc. 144 at 31) or should be excused (*id*. at 32-35), therefore, are moot.

percentage in the community. More important, McNeill did not produce, and defense counsel conceded he could not produce, any evidence of the systematic exclusion of African–Americans from the jury selection process employed in Lorain County.

Moreover, McNeill's systematic-exclusion claim is based solely on alleged underrepresentation on his venire. But underrepresentation on a single venire is not systematic exclusion. See *Ford v. Seabold* (C.A.6, 1988), 841 F.2d 677, 685. Cf. *Duren*, 439 U.S. at 366, 99 S.Ct. at 669, 58 L.Ed.2d at 588 (discrepancy "not just occasionally, but in every weekly venire for a period of nearly a year" showed systematic exclusion).

*McNeill*, 83 Ohio St. 3d at 443-44.

The Supreme Court clearly established the test for a *prima facie* violation of the fair-cross-section requirement in its "pathmarking decision" in *Duren v. Missouri*, 439 U.S. 357 (1979), requiring a defendant to demonstrate that: (1) a group qualifying as "distinctive" (2) is not fairly and reasonably represented in jury venires, and (3) "systematic exclusion" in the jury-selection process accounts for the underrepresentation. *Berghuis v. Smith*, 559 U.S. 314, 327-33 (2010) (citing *Duren*, 439 U.S. at 364) (observing that *Duren* clearly established the test for *prima facie* violation of the fair-cross-section requirement for purposes of § 2254(d)(1)). The Ohio Supreme Court applied *Duren*'s test in analyzing McNeill's claim. *See McNeill*, 83 Ohio St. 3d at 444 (relying on its own decision in *State v. Fulton*, 57 Ohio St. 3d 120 (Ohio 1991), which in turn relied on *Duren*).

McNeill does not contest the Ohio Supreme Court's determination that he did not satisfy *Duren*'s requirement that he show a systematic exclusion of African–Americans from Lorain County's jury selection process. (See Doc. 144 at 26-28.)[11] The Ohio Supreme

---

[11] Moreover, McNeill concedes that the expert report he submitted on post-conviction review also could not make that showing. (Doc. 144 at 27; Doc. 116-3 (Post-Conviction Petition) at 152-53; Doc. 146-1 (Wiley Aff.).) The expert concluded that "Lorain County non-White and Hispanic residents were seriously underrepresented in the April 10, 1995 jury panel." (Doc. 146-1

Court reasonably concluded that McNeill had not met the standard for a fair-cross-section violation.

## 2. equal protection

As to McNeill's equal-protection argument, the Ohio Supreme Court stated:

Turning to McNeill's equal protection claim, we base our analysis on the test set forth in *Fulton*:

"A defendant may also reasonably bring a federal equal protection challenge to the selection and composition of the petit jury by adducing statistical evidence which shows a significant discrepancy between the percentage of a certain class of people in the community and the percentage of that class on the jury venires, which evidence tends to show discriminatory purpose, an essential element of such cases." 57 Ohio St.3d at 123–124, 566 N.E.2d at 1200.

The challenger must show underrepresentation over a significant period of time, and may "'support[ ] the presumption of discrimination raised by the statistical showing'" by exposing the selection procedure as susceptible of abuse or racially partial. *Id.* at 122, 566 N.E.2d at 1199, quoting *Castaneda v. Partida* (1977), 430 U.S. 482, 494–495, 97 S.Ct. 1272, 1280–1281, 51 L.Ed.2d 498, 510–511.

On these terms, McNeill's equal protection challenge also fails. McNeill did not attempt to show underrepresentation over a significant period of time: he points to only his own venire and indeed failed to show underrepresentation there. Accordingly, we overrule McNeill's sixteenth proposition of law.

*McNeill*, 83 Ohio St. 3d at 444.

McNeill contends this decision was "contrary to" Supreme Court precedent. (Doc. 144 at 28-30.) He points to the early cases of *Avery v. State of Georgia*, 345 U.S. 559 (1953), and *Batson v. Kentucky*, 476 U.S. 79 (1986), which he claims allow petitioners to

---

at 1-2.) But she acknowledged that information from only one jury panel was "not a large enough sample from which to draw the conclusion that there is systematic underrepresentation" or whether "underrepesentation is a statistically significant occurrence . . . ." (*Id*. at 4.)

provide a *prima facie* case of racial discrimination in the selection of the venire by making a sufficient showing of discrimination in the organization of a particular panel. (Doc. 144 at 29.)

The state court's articulation of the legal standard for establishing a *prima facie* case of racial discrimination in the selection of the venire, however, is consistent with Supreme Court precedent, including *Avery, Batson,* and *Castaneda v. Partida*, 430 U.S. 482 (1977). This "long line of Supreme Court cases" requires petitioners to show "*either* (1) underrepresentation of the petitioner's race on the particular grand jury that indicted the petitioner and a selection system that is subject to abuse; *or* (2) underrepresentation of the petitioner's race on numerous grand juries over a significant period of time." *Jefferson v. Morgan*, 962 F.2d 1185, 1191 (6th Cir. 1992) (emphasis in original). Either showing creates an inference that the state discriminated in selecting a petitioner's particular jury. *Id.*

As the state court reasonably concluded, McNeill did not satisfy either standard. McNeill concedes that he has not shown underrepresentation over a significant period of time. (Doc. 144 at 27-28.) But neither has he demonstrated that a "significant" underrepresentation of African-Americans in the venire in his case and a "selection procedure [that was] susceptible of abuse or racially partial." *McNeill*, 83 Ohio St. 3d at 444 (internal quotation marks and citations omitted). McNeill argues that he demonstrated the underrepresentation of African-Americans in the venire in his case through the 1990 Census, which he submitted to the Ohio Supreme Court on direct appeal. (*See* Doc. 144 at 25-26.) He alleged the information showed that while only four percent of the potential jurors in his venire were African-American, African-Americans accounted for fourteen

percent of Lorain County's population.  (Doc. 116-2 (Appellate Brief) at 190-91, 271.)[12]

The Ohio Supreme Court reasonably concluded that this evidence was insufficient to show

that African-Americans were significantly underrepresented on his venire and that Lorain

County's jury selection system provided "an opportunity for discrimination."  *Batson*, 476

U.S. at 95.  This claim also lacks merit.

Thus, McNeill has not shown that the Ohio Supreme Court's decision rejecting his

jury-composition claim is contrary to, or an unreasonable application of, Supreme Court

precedent, or is based on an unreasonable determination of fact.

**C.**      **Fifth and Fifteenth Grounds for Relief:  *Trial-Court Error / Evidentiary Rulings***

McNeill argues in his fifth and fifteenth grounds for relief that the trial court erred

by permitting two children to testify at trial and by admitting prejudicial "other acts"

evidence.  He claims admission of this evidence violated his due process rights and

permitting the children to testify also violated the Sixth Amendment's Confrontation

Clause.  (*See* Doc. 144 at 36-40, 103-09.)

**1.      Procedural Posture**

McNeill raised these evidentiary claims in state courts on direct appeal.  (*See* Doc.

116-2 at 96-103, 129-36.)  Respondent argues, however, that the claims are procedurally

defaulted because McNeill did not fairly present to state courts the federal constitutional

grounds for the claims that he asserts here.  (Doc. 145 at 18, 29-30.)  The Court agrees.

As explained above, to exhaust a claim in state court and thereby preserve it for

_____

[12] This figure is contradicted by McNeill's expert, who stated in an affidavit submitted with his post-conviction petition that the 1990 Census showed that African-Americans made up 7.8 percent of Lorain County's population.  (Doc. 146-1 at 2 (Wiley Aff.).)

federal habeas review, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'"  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).  In presenting his "other acts" claim to the Ohio Supreme Court, McNeill referenced his "rights to a fair trial, to due process and to a reliable death sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments."  (Doc. 116-2 at 96.)  But he did not cite one federal case or employ any due process analysis.  The eight pages of argument in his merits brief contained citations only to Ohio evidentiary rules and case law.  (*See id*. at 96-103.)  In presenting his claim regarding the children's testimony, McNeill similarly made two general references each to the right to a "fair trial," "due process," and "reliable capital sentencing" under the U.S. Constitution.  (*Id*. at 129, 136.)  But he never mentioned the Confrontation Clause once, did not provide any federal constitutional analysis, and otherwise relied only on state evidentiary rules and case law.  (*See id*. at 129-36.)

　　　"A petitioner need not cite 'chapter and verse' of constitutional law, . . . but '[g]eneral allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated.'"  *Blackmon v. Booker*, 394 F.3d 399, 401 (6th Cir. 2004) (quoting *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987) and *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir.2000)).  McNeill did not fairly present his evidentiary claims as federal constitutional claims in state court.  *See id.* (holding claim not fairly presented where petitioner's only citation to federal authority appeared in a section heading and petitioner "failed to develop any cogent arguments regarding those rights beyond the naked assertion that they were violated"); *Slaughter v. Parker*, 450 F.3d

224, 236 (6th Cir. 2006) (finding claim of "denial of due process and a fair trial" in violation of "14th and 6th Amendments" without citation to federal constitutional cases insufficient for fair presentation).

And, because McNeill no longer is able to raise these claims in state court, the claims are procedurally defaulted. *See Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."); *State v. Perry*, 10 Ohio St. 2d 175 (Ohio 1967) (holding that *res judicata* bars a criminal defendant from raising in post-conviction proceedings those claims that could have been raised on direct appeal); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("[I]f an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review."). Furthermore, McNeill does not make any showing regarding either the cause for, or prejudice resulting from, this procedural default, nor does he argue that his actual innocence should excuse the default of these claims. These claims are procedurally defaulted.

### 2. Merits Analysis

Even if McNeill had fairly presented his federal constitutional claims to state court regarding the admission of the child witnesses' testimony and other acts evidence, and the claims were not procedurally defaulted, the claims would fail.

As Respondent notes, to the extent McNeill's claims allege violations of Ohio evidentiary law, they are not cognizable on federal habeas review. (Doc. 141 at 90–91, 139-40.) Generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012). Federal

habeas courts presume that state courts correctly interpret state law in their evidentiary rulings. *Small v. Brigano*, No. 04-3328, 2005 WL 1432898, at *5 (6th Cir. June 17, 2005). Their review of state-court evidentiary rulings, therefore, "is limited to whether [a petitioner] can demonstrate a violation of his federal constitutional rights." *Haliym v. Mitchell*, 492 F.3d 680, 700 (6th Cir. 2007) (citing *Bell v. Arn*, 536 F.2d 123, 125 (6th Cir. 1976)).

### a.      testimony of child witnesses

The last state court to review McNeill's evidentiary claims was the Ohio Supreme Court, which reasoned:

> In his seventh proposition of law, McNeill contends [C.R.] and [R.G.] were incompetent to testify as witnesses. [C.R.] was seven years old at the time of the trial and [R.G.] was six.

> Evid.R. 601(A) provides: "Every person is competent to be a witness except * * * children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

> In determining the competence of a child witness, the trial court must consider the child's ability to receive, recall, and communicate accurate impressions of fact, understand truth and falsity, and appreciate the responsibility to tell the truth. *State v. Frazier* (1991), 61 Ohio St.3d 247, 574 N.E.2d 483, syllabus. Because the trial court has the opportunity to observe the child's appearance, manner of responding to questions, general demeanor and ability to relate facts accurately and truthfully, its determination will not be reversed absent an abuse of discretion. *Frazier*, 61 Ohio St.3d at 250–251, 574 N.E.2d at 486–487. See, also, *State v. Allard* (1996), 75 Ohio St.3d 482, 496, 663 N.E.2d 1277, 1290.

> Applying the foregoing to the record before us, we find no abuse of discretion by the trial court in determining the children were competent to testify. While the children could not answer every question posed, the transcript indicates they were in fact able to receive, recollect, and communicate impressions of fact, and appreciate the responsibility to be truthful.[1]

> > FN 1: [C.R.] knew in what city he lived, who lived with him, his full name, the names of his mother, grandmother, and brother, and how old

he and his brother were at the time of trial. [C.R.] also knew he was in the first grade, and although he could not name his school, he could name his teachers, knew what subjects he studied, and correctly recited the alphabet. [C.R.] knew what color his pants and the judge's robe were, accurately described the weather on the day he testified, and answered correctly when the judge asked how many fingers he was holding up. Furthermore, [C.R.] knew the difference between the truth and a lie, for he was able to correctly identify examples of each. He knew it was bad to lie because his mother told him he was not to tell lies, believed that he would "get in trouble" if he lied, and that "[y]ou'd go to jail" for lying in court.

[R.G.] also knew with whom he lived, what school he attended, his teacher's name, his grade, and the name of a TV show he liked. He accurately described his clothing, the color of the judge's robe, and how many fingers the judge held up. [R.G.], like [C.R.], knew the difference between the truth and a lie. He stated that it was bad to lie, that he "would get in trouble" if he lied in court, and that his mother would "whip" him if he told a lie.

Moreover, "[n]o federal court has held that the Constitution places limits on allowing even the youngest child to testify at trial," so long as the child is found to be competent. *Walters v. McCormick* (C.A.9, 1997), 122 F.3d 1172, 1176. Because the trial court did not abuse its discretion in finding [C.R.] and [R.G.] competent to testify, McNeill's seventh proposition of law is overruled.

*McNeill*, 83 Ohio St. 3d at 442-43.

McNeill argues that the Ohio Supreme Court's finding that two of the children who testified against him were competent was an unreasonable determination of fact under AEPDA's § 2254(d)(2), and he is therefore entitled to relief on his claims that the trial court violated his rights to due process and to confront witnesses against him by admitting the children's testimony. (Doc. 144 at 39-40.)

The Supreme Court has not established a definition of witness competence required by the Due Process Clause. *Moreland*, 699 F.3d at 923 (citing *Kentucky v. Stincer*, 482 U.S. 730, 741 n.11 (1987)). Nevertheless, state-court evidentiary rulings may "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions

and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

The Confrontation Clause of the Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The provision's "central concern . . . is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). In *Craig*, the Supreme Court held that the Confrontation Clause did not prohibit a defendant's six-year-old accuser from testifying over a closed-circuit television rather than face-to-face because the other "elements of confrontation" were present: the child was competent to testify, testified under oath, was subject to contemporaneous cross-examination, and the judge, jury and defendant were able to observe the witness's demeanor. *Id*. at 851. These safeguards, the Court concluded, "ensure[d] that the [child's] testimony [was] both reliable and subject to vigorous adversarial testing . . . ." *Id*.

The Sixth Circuit similarly rejected a habeas petitioner's claim that the admission of a seven-year-old witness's testimony violated his confrontation rights because the child was incompetent and did not understand the oath. *Haliym*, 492 F.3d at 699-703. The court observed that "some minimum capacity for recording and relaying truthful information is a precondition to a meaningful oath to tell the truth, which is a necessary element of cross-examination." *Id*. at 703. It declined to define that minimum capacity, but "consider[ed] it satisfied for purposes of the Confrontation Clause if the witness is able to understand the concept of the truth and his duty to present truthful information to the court."

*Id.*  The court further cautioned that a state court's findings of fact made in connection with state evidentiary issues are binding for purposes of the constitutional inquiry absent clear and convincing evidence to the contrary.  *Id.* at 700 (citing 28 U.S.C. § 2254(e)(1); *Mitzel v. Tate*, 267 F.3d 524, 537 (6th Cir. 2001)).  In that case, the court held that the Ohio Supreme Court's factual findings that the child witness exhibited an understanding of truth and falsity and appeared to appreciate his responsibility to be truthful were not clearly erroneous.  *Id.* at 703.  The child stated that he would tell the truth, that it was good to tell the truth, and that he would be punished if he lied.  *Id.*  He also was cross-examined and "generally responsive" to the cross-examination.  *Id.*

Here, McNeill argues that the following voir dire testimony of the child witnesses, C.R and R.G, demonstrates that the Ohio Supreme Court's finding that they were competent was clearly erroneous:

1.  C.R. was unable to spell his name, remember his birthday, or recall any Christmas presents he had received only four months before.

2.  C.R. testified that the only thing he could remember that "happened a long time ago" was "that guy got shot in the head."

3.  C.R. testified that he was "not sure" what he was "asked . . . to do" by taking the oath.

4.  When asked, "Now, when that man came up and asked you to raise your right hand, do you remember what he asked you to do?" R.G. first answered, "Yeah." Then in response to the follow-up question, "What did he ask you to do?" he answered, "Raise my right hand."

5.  R.G. was unable to remember his name at the beginning of voir dire and testified that the weather was "hot" even though it was cool and rainy that day.

(Doc. 137 at 44-47 (citing Doc. 117-4 at 110, 112-13, 119, 121 (C.R. Test.); 148, 152-53 (R.G. Test.)).)

McNeill has not demonstrated that the state court's conclusion that C.R. and R.G.

"were in fact able to receive, recollect, and communicate impressions of fact, and appreciate

the responsibility to be truthful" or any of the specific factual findings supporting that

conclusion were clearly erroneous. First, the boys corrected much of the testimony McNeill

cites. C.R. was able to testify about past events in some detail, and upon further

questioning, he promised to tell the truth. (Doc. 117-4 at 114-15, 119-20.) And R.G. later

acknowledged that the oath involved a promise to tell the truth and provided his nickname

in early testimony and later provided his full name. (*Id*. at 148, 153, 156.) Moreover, the

state court found and McNeill concedes, that both boys testified that they were "able to

understand the concept of the truth and [their] duty to present truthful information to the

court." *Haliym*, 492 F.3d at 703. (*See* Doc. 117-4 at 118-22 (C.R Test.), 152-53 (R.G.

Test.).)

Accordingly, the Ohio Supreme Court's decision was not based on an unreasonable

determination that C.R. and R.G. were competent to testify, and the trial court's admission

of their testimony, therefore, was neither fundamentally unfair nor a violation of McNeill's

confrontation rights.

### b. "other acts" evidence

Regarding McNeill's other acts evidentiary claim, the Ohio Supreme Court stated:

> In his third proposition of law, McNeill argues the state introduced evidence of
> "other acts" in violation of Evid.R. 404(B). Lorain Police Detective Arnie
> Berrios testified he arrested McNeill in 1992 for selling drugs at the corner of
> Massachusetts Avenue and G Street; McNeill possessed over twenty-five doses
> of crack at the time. The trial court properly instructed the jury it could not
> consider the testimony "to prove the character of the Defendant in order to show
> that he acted in accordance with that character," but could consider it in
> determining "identity and/or knowledge." Absent evidence to the contrary, we
> presume the jury followed these instructions. *State v. Woodard* (1993), 68 Ohio

St.3d 70, 73–74, 623 N.E.2d 75, 78.

> Pursuant to Evid.R. 404(B), evidence of other acts, crimes, or wrongs is admissible to prove identity. *State v. Allen* (1995), 73 Ohio St.3d 626, 632, 653 N.E.2d 675, 683; *State v. Davis* (1991), 62 Ohio St.3d 326, 338, 581 N.E.2d 1362, 1374. In this case, Berrios's testimony was relevant to corroborate Rushinsky's identification of McNeill as the shooter. Rushinsky testified he and Fulton knew McNeill from prior drug purchases. However, on cross-examination the defense attacked Rushinsky's identification, forcing him to admit he initially told police he never purchased drugs from McNeill. Berrios's testimony, which tended to show McNeill was in the business of selling drugs and his place of business was the corner of Massachusetts Avenue and G Street, served to rehabilitate Rushinsky. The testimony tended to make it more believable that Rushinsky spoke truthfully when testifying he previously purchased drugs from McNeill and therefore recognized him on the evening of May 13, 1994.

> McNeill further contends Berrios's testimony was unnecessary to prove identity because the four children also identified McNeill. However, need is irrelevant to an Evid.R. 404(B) objection; moreover, McNeill also attacked the reliability of the children's testimony.

> Because Berrios's testimony was admissible to prove identity under Evid.R. 404(B), McNeill's third proposition of law is overruled.

*McNeill*, 83 Ohio St. 3d at 441-42.

McNeill first argues that AEDPA does not apply to this claim because the Ohio Supreme Court did not address his federal constitutional ground for the claim on the merits. (Doc. 144 at 107.)  He concedes that a state court is presumed to have adjudicated a claim "on the merits" for purposes of triggering AEDPA deference.  (*Id.* (citing *Johnson v. Williams*, 568 U.S. 289, 292-93 (2013)).)  But he contends the presumption is rebutted here because the state court's decision "clearly limited its analysis to the state evidentiary issue that McNeill presented."  (*Id.* at 107-08.)  The Supreme Court has made it clear, however, that the presumption that a state court has adjudicated a claim on the merits applies regardless of whether the state court provided little or no reasoning at all for its decision.

*Harrington v. Richter*, 562 U.S. 86, 99 (2011).

McNeill next argues that the state court's decision was "contrary to clearly established federal law by treating its rejection of McNeill's claim under [Ohio Evidence] Rule 404(B) as necessarily foreclosing his constitutional claims." (Doc. 144 at 108-09.) But the court did not make any such representation regarding McNeill's constitutional claims; it was merely silent regarding the federal-law bases of McNeill's claim (perhaps an indication that the federal constitutional claims were not fairly presented). Furthermore, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Regardless, to the extent that McNeill is asserting that despite the Ohio Supreme Court's finding of compliance with the Ohio Evidence Rule 404(B), the admission of the evidence at issue was so unfairly prejudicial that it violated his fundamental right to a fair trial, his claim is meritless. McNeill argues the evidence of his prior arrest was irrelevant and unduly prejudicial because it had no connection to the murder; many people bought and sold drugs at that location. As the state court explained, however, Detective Berrios' testimony that McNeill was arrested for selling drugs at the same location that Rushinsky testified he and Fulton encountered the drug-dealing assailant corroborated Rushinsky's identification of McNeill as the shooter. The evidence was not probative standing alone; it was relevant in relation to and in corroborating other evidence. The trial court's admission of this other acts evidence, therefore, was not so fundamentally unfair as to rise to the level of a due process violation.

Thus, the Ohio Supreme Court decisions rejecting McNeill's evidentiary claims in

his fifth and fifteenth grounds for relief did not contravene or misapply Supreme Court precedent, and were not based on an unreasonable determination of fact.

### D.     Sixth and Eighth Grounds for Relief:  *Prosecutorial Misconduct*

McNeill alleges in his sixth and eighth grounds for relief that prosecutors rendered his trial fundamentally unfair in two respects, by:  (1) instructing Rushinsky not to talk to defense counsel; and (2) making improper comments during closing arguments.  (*See* Doc. 144 at 41-46, 77- 93.)

#### 1.     Procedural Posture

Respondent argues that these claims are procedurally defaulted.  (Doc. 141 at 95, 113-14.)

##### a.     Rushinsky instruction

McNeill raised his claim regarding prosecutors' allegedly improper instruction to Rushinsky to state courts on post-conviction review.  (Doc. 116-3 at 162-63.)  As supporting extra-record evidence, he submitted an affidavit of an investigator with the Ohio Public Defender Commission, who stated that Rushinsky refused his request for an interview because "he had been advised by [the] prosecutor at trial not to discuss the case with defense counsel . . . ."  (*Id*. at 624 (Rooks Aff.).)  The post-conviction appellate court found the claim barred by *res judicata* because "[t]he evidence [McNeill] attached, a hearsay statement of the witness, fail[ed] to demonstrate that this argument could not have been raised by trial counsel prior to trial."  *McNeill*, 137 Ohio App. 3d at 42.  "Certainly," it noted, "if the allegation was true, trial counsel was aware of the problem prior to trial and

could have raised the issue then." *Id.*[13]

McNeill argues that this Court should disregard the *res judicata* bar because the state court misapplied the rule. The claim could not have been raised on direct appeal, he contends, because there was no evidence of the alleged instruction in the trial-court record. (Doc. 144 at 43 (citing *Richey v. Bradshaw*, 498 F.3d 344, 359-60 (6th Cir. 2007)).) But the state court correctly applied *res judicata* because it found the issue should have been raised at *trial,* not on direct appeal. *See State v. Steffen*, 70 Ohio St. 3d 399, 410 (Ohio 1994) ("*res judicata* bars any claim that was or could have been raised at trial or on direct appeal").

Alternatively, McNeill argues that the state court's assertion of the *res judicata* bar should not be enforced under *Lee v. Kemna*, 534 U.S. 362 (2002), in which the Supreme Court held that "there are . . . exceptional cases in which exorbitant application of a generally sound [state procedural] rule renders the state ground inadequate to stop consideration of a federal question." *Id.* at 376 (citing *Davis v. Wechsler*, 263 U.S. 22, 24 (1923)). The Court concluded in *Kemna* that the petitioner's violation of a Missouri state rule requiring that continuance motions be written and accompanied by an affidavit would not bar federal habeas review, as the rule was not the basis for the trial court's denial of the petitioner's motion and the petitioner in effect had substantially complied with the rule's purpose. *Id.* at 385.

McNeill presents no cogent argument that any such exceptional circumstances exist to overcome the procedural bar invoked here; he offers only a conclusory assertion that the

---

[13] Respondent asserts in a conclusory fashion that this sentence amounts to an alternative merits analysis of this claim. (Doc. 145 at 21 n.3.) That argument is unpersuasive; the state court clearly was explaining the basis for its procedural ruling, not conducting a separate merits analysis.

state court's application of the bar was "exorbitant." (*See* Doc. 144 at 43.) In fact, there was nothing inequitable or overly strict in the state appellate court's application of the *res judicata* rule to McNeill's prosecutorial-misconduct claim. The common procedural rule was applied in a straightforward and customary manner to bar review of a claim on post-conviction that McNeill clearly could have raised before trial, as the court noted, but did not. This argument also fails.

McNeill's claim regarding the prosecution's alleged instruction to Rushinsky, therefore, is procedurally defaulted. Moreover, he does not argue that there is cause for, or prejudice resulting from, the claim's default.

### b.    closing argument comments

Respondent asserts that McNeill's claim faulting allegedly improper remarks the prosecution made during closing arguments also is procedurally defaulted. (Doc. 141 at 113-14.) McNeill raised this claim in state courts on direct appeal. *See McNeill*, 83 Ohio St. 3d at 447-48. However, the last state court to review the claim, the Ohio Supreme Court, found that McNeill had waived it by failing to object to the complained-of comments at trial and conducted a plain-error review of the claim. *Id*. at 447; *see State v. Long*, 53 Ohio St. 2d 91, 96-97 (Ohio 1978) (In "exceptional circumstances," Ohio courts may examine a claim that is otherwise waived due to the violation of a procedural rule for "plain error," when "but for the error, the outcome of the trial clearly would have been otherwise."); Ohio R. Crim. P. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

Ohio's contemporaneous objection rule requires that a party preserve an error for appeal by calling it to the attention of the trial court at a time when the error could have

been avoided or corrected. *State v. Mason*, 82 Ohio St. 3d 144, 162 (Ohio 1998); *State v. Glaros*, 170 Ohio St. 471, para. one of the syllabus (Ohio 1960). McNeill argues that this rule is not an independent and adequate state ground because Ohio courts do not regularly and consistently apply it. (Doc. 144 at 88-89.) The Sixth Circuit has repeatedly held, however, that the failure to adhere to this "firmly-established" rule is "an independent and adequate state ground" upon which to find federal habeas claims procedurally defaulted. *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012)*; Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000). Moreover, "the Ohio Supreme Court's plain error review does not constitute a waiver of the state's procedural default rules and resurrect the issue . . . ." *Keith*, 455 F.3d at 673-74. This claim, therefore, is procedurally defaulted.

McNeill contends his trial counsel's ineffective assistance for failing to object to the allegedly improper comments provides cause to excuse the procedural default. (Doc. 144 at 89-90.) Attorney error that constitutes ineffective assistance of counsel may establish cause for the procedural default of a habeas claim. *Coleman v. Thompson*, 501 U.S. 722, 754 (1991). As will be explained below, however, the Court finds this claim of ineffective assistance of counsel meritless. Because Petitioner has not established "cause," the Court need not consider the "prejudice" prong of the procedural default analysis. *See, e.g., Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

### c.     actual innocence

McNeill asserts, however, that any default of his prosecutorial-misconduct claims should be excused under the "fundamental miscarriage of justice," or "actual innocence," exception to the cause-and-prejudice requirement. (Doc. 144 at 43-46, 90-93.) The

Supreme Court has held that this "narrow exception" applies only where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004). To demonstrate "actual innocence," a petitioner must show "'by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner [guilty] under the applicable state law.'" *Id*. (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)). The claim requires a showing of "new reliable evidence" and factual innocence, not mere legal insufficiency. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Bousley v. United States*, 523 U.S. 614, 623 (1998).

McNeill has not met this burden. He first argues that the State's case against him was "weak to begin with." (Doc. 144 at 44.) He notes, for example, Rushinsky's credibility problems as a drug user; the lack of physical evidence connecting him to the murder; and the child witnesses' incompetency and contradictory testimony. (*Id.* at 44-46.) But that is not new evidence; it was all in the trial-court record. Moreover, this argument relates to the legal sufficiency of the State's case, not McNeill's factual innocence.

McNeill does cite two sources of "new" evidence to support his "actual innocence" claim: tapes of police interviews with the State's key witness and the only adult eyewitness to the crime, Robert Rushinsky, in which he fails to identify McNeill from an initial photo lineup and is potentially coached to identify him from a second array (Docs. 133-2, 133-3 (Rushinsky Interview Tapes); and a 2018 affidavit of Kimberly Sandford, McNeill's former girlfriend, in which she "clarifie[s], expand[s] upon, or correct[s]" her trial testimony that she saw McNeill the day of the shooting, and he asked her for money and threatened her with a gun (Doc. 142-1 (Sandford Aff.)). But this evidence does not prove McNeill's

factual innocence either.

As will be explained in relation to McNeill's suppressed-evidence claims (asserted in his seventh and twenty-seventh grounds for relief), the Rushinsky interview tapes were favorable evidence that defense counsel could have used at trial to undermine the State's star witness' credibility. Nevertheless, demonstrating that Rushinsky may have had difficulty identifying McNeill from a group of Polaroid photographs, or even received coaching form the police to help him identify McNeill from a second photo array, is not clear and convincing evidence of McNeill's innocence.

Similarly, Sanford now avers that detectives pressured her into testifying untruthfully, and that McNeill did not ask her for money, threaten her, or show her his gun the afternoon of the murder as she testified. (Doc. 142-1 at 3-4.) But this belated recantation does not exonerate McNeill. Sandford acknowledges that she saw McNeill with a gun "several days" before the murder and states that she "ha[s] no idea who committed the murder in this case." (*Id*. at 3, 4.) Moreover, "[r]ecanting affidavits and witnesses are viewed with extreme suspicion by the courts." *Byrd v. Collins*, 209 F.3d 486, 508 n.16 (6th Cir. 2000) (internal quotation marks and citation omitted).

McNeill, therefore, has presented no "new reliable evidence – exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. And he has not made a credible showing of actual innocence under *Schlup*. Accordingly, McNeill's prosecutorial-misconduct claims asserted in his sixth and eighth grounds for relief are procedurally defaulted.

### 2. Merits Analysis

Even if McNeill's prosecutorial-misconduct claims were ripe for habeas review, they

would fail.  The Supreme Court established the test for claims of prosecutorial misconduct in *Darden v. Wainwright*, 477 U.S. 168 (1986):  "The relevant question is whether the prosecutors' [conduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id.* at 181 (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983), and *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  The Court emphasized that "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'"  *Id.* (quoting *Donnelly,* 416 U.S. at 642); *see also Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) ("We do not possess supervisory powers over state court trials."); *Cook v. Bordenkircher*, 602 F.2d 117, 119 n.5 (6th Cir. 1979) ("[I]t is the responsibility of the [state courts] to police their prosecutors; we have no such authority.").  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct," therefore, "is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

The *Darden* standard "is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations' . . . ."  *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarlborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  As the Supreme Court advised decades ago,

> In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure.  To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

*Johnson v. United States*, 318 U.S. 189, 202 (1943) (Frankfurter, J., concurring).

### a.       Rushinsky instruction

McNeill alleges that his due process rights were violated when the prosecution instructed its key witness and only adult eyewitness to the shooting, Robert Rushinsky, not to discuss the case with defense counsel. (*See* Doc. 144 at 41-42.) He supports this claim with an affidavit of the defense's investigator, in which he averred that Rushinsky refused his request for an interview because "he had been advised by [the] prosecutor at trial not to discuss the case with defense counsel . . . ." (Doc. 116-3 at 624 (Rooks Aff.).) McNeill argues that the prosecution's conduct interfered with his attorneys' ability to prepare for trial, and that if defense counsel had been able to interview Rushinsky prior to trial, they "might have" discovered material information the prosecution allegedly suppressed – that Rushinksy initially failed to identify McNeill in a photo array and the police conducted a second interview of Rushinsky. (*Id*. at 41-42.) With this information, McNeill contends, it is "reasonably probable" that he would have been acquitted. (*Id*. at 42.) Because the state courts did not adjudicate this claim on the merits, this Court reviews it *de novo*. *See, e.g., Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011).

In *Workman v. Bell*, 178 F.3d 759 (6th Cir. 1998), the Sixth Circuit recognized that instructing a witness not to cooperate with the defendant or with defense counsel "would not be proper . . . ." *Id*. at 771 (internal quotation marks and citation omitted). Nevertheless, it explained, "a witness is free to talk or not unless compelled by order of the court." *Id*. at 771-72 (internal quotation marks and citation omitted). A defendant's "right to access is tempered by a witness' equally strong right to refuse to say anything." *Id*. at 772 (internal quotation marks and citation omitted). A prosecutor advising a witness of his right not to submit to the interview, therefore, does not deny the defendant a fair trial. *Id*. Moreover, it

observed, a defendant claiming a denial of due process must show more than just witness inaccessibility; he or she must demonstrate specific prejudice from the denial of access. *Id.*

The problem here, as Respondent argues, is that McNeill has no credible evidence that the prosecutors' alleged instruction to Rushinsky ever occurred. (Doc. 141 at 96.) The investigator's affidavit is uncorroborated hearsay evidence. Rushinsky never attested to the conversation taking place, and there is nothing in the trial record or Rushinsky's trial testimony indicating that defense counsel sought to interview Rushinsky before trial. (*Id.*) Nor does McNeill identify any evidence to support his assertion that Rushinsky would have shared any information at all with the defense, much less information that would have resulted in his acquittal, or would have led to defense counsel's discovery of suppressed evidence. This claim is purely speculative and meritless.

### b. closing argument comments

McNeill complains that the prosecutors made numerous improper remarks during closing arguments, including: (1) comments that the State's case was "uncontradicted"; (2) victim impact evidence; and (3) comments that were critical of defense counsel. (*See* Doc. 144 at 77-78.) As noted above, the Ohio Supreme Court conducted a plain-error review of these claims, as it found McNeill had waived them by failing to object to the allegedly improper statements at trial. *McNeill*, 83 Ohio St. 3d at 447-48. The court found no plain error in any of the comments. *Id.* But it specifically addressed only one type of remark challenged here, those calling the State's case "uncontradicted." *Id.* AEDPA deference applies to a state court's plain-error analysis. *Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017).

Generally speaking, prosecutors remain free to "summarize the evidence and comment on its quantitative and qualitative significance." *Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003) (internal quotation marks and citation omitted). And they "have 'leeway' during their summation to argue 'reasonable inferences from the evidence.'" *Webb v. Mitchell*, 586 F.3d 383, 396-97 (6th Cir. 2009) (quoting *Byrd*, 209 F.3d at 535). As the Supreme Court has cautioned,

> [A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.

*United States v. Young*, 470 U.S. 1, 11 (1985).

In this case, the Ohio Supreme Court reasonably concluded that the prosecution's challenged remarks did not affect the fairness of McNeill's trial.

*State's case as "uncontradicted."* McNeill first complains about two statements the prosecutor made in the beginning of his closing argument characterizing the "State's case" as "uncontradicted." (Doc. 117-5 (Trial Tr.) at 84.) He contends these remarks could not "reasonably be understood as anything other than a comment on McNeill's failure to testify in his own defense." (Doc. 144 at 77, 80-81.) The Ohio Supreme Court disagreed, deciding that "[t]aken in context, the prosecutor's statement that the state's case was 'uncontradicted' was not a comment on the defendant's failure to testify." *McNeill*, 83 Ohio St. 3d at 447-48.

The Fifth Amendment provides that "no person ... shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. The Supreme Court has held that a prosecutor's direct reference to a criminal defendant's failure to testify violates this privilege against compelled self-incrimination. *Griffin v. California*, 380 U.S. 609, 614

72

(1965). In other words, the "prosecution may not comment on a defendant's refusal to testify." *Webb*, 586 F.3d at 395.

In this case, however, McNeill is claiming that the prosecutor *indirectly* commented on McNeill's refusal to testify by remarking on the lack of evidence contradicting the State's "case." This claim fails. First, the Sixth Circuit has held that a reference to evidence as uncontradicted "does not reflect on a defendant's failure to testify if evidence other than the defendant's own testimony could have contradicted it." *Id*. at 396 (citing *Joseph v. Coyle*, 469 F.3d 441, 474 (6th Cir. 2006); *Raper v. Mintzes*, 706 F.2d 161, 164 (6th Cir. 1983)). McNeill was not the only person who could have been called to refute the State's case; Rushinsky, for one, was an eyewitness to the crime as well as the events leading up to the crime – and he did in fact testify.

Moreover, even if only McNeill could have contradicted aspects of the State's case, "the Supreme Court has not held that such comments invariably violate *Griffin* . . . ." *Id*. at 397 (rejecting the petitioner's claim based on the prosecutor's reference "to a piece of evidence as 'uncontradicted' that only Webb could have contradicted" ). Indeed, the Supreme Court has never clearly established that a prosecutor may not characterize evidence in a way that indirectly references a defendant's failure to testify. *See Tevis v. Sims,* No. 5:17cv118, 2017 WL 9855227, at *10 (E.D. Ky. Sept. 29, 2017) ("Simply put, there is no "clearly established Federal law" . . . that a prosecutor indirectly commenting on an accused's silence in the manner the Commonwealth here did violates the Constitution."); *Mitchell v. Palmer*, No. 1:06cv854, 2010 WL 395820, at *25-27 (W.D. Mich. Jan. 28, 2010) (*Webb* "acknowledges that *Griffin* did not establish a constitutional rule prohibiting the

prosecution from describing evidence as uncontradicted, even in instances where only the defendant could have offered contrary testimony"); *see also Edwards v. Roper*, 688 F.3d 449, 460 (8th Cir. 2012) ("the Supreme Court has never clearly established that a prosecutor may not comment on the evidence in a way that indirectly refers to the defendant's silence"); *Yancey v. Gilmore*, 113 F.3d 104, 106-07 (7th Cir. 1997) (rejecting petitioner's claim regarding "indirect references to a defendant's failure to testify" as "without a Supreme Court case to support his claim"). The Ohio Supreme Court, therefore, did not unreasonably apply clearly established Supreme Court precedent by rejecting this claim.

*Victim impact evidence*. McNeill also complains that the prosecutor improperly commented on the victim during his guilt-phase closing argument. (Doc. 144 at 78, 81.) He specifically finds fault with the prosecutor's argument that:

> Blake Fulton was a human being. He had a family, you may have noticed, that sat through a lot of this trial. His picture is in his personal effects. He was a master locksmith. He had a life. He was a crack addict. So was Rushinsky. He deserves the protection of the law just as the Defendant is seeking and deserves. But what he has done is, he has determined that Blake Fulton's life had a value of $20. You, as jurors, because the law and the evidence will permit it and demand it in this case, have the right to reevaluate that judgment, and to tell him that Blake Fulton's life is going to cost him a lot more than 20 bucks.

(*Id*. at 78 (quoting Doc. 117-5 (Trial Tr.) at 91).)

The Supreme Court has held that the Constitution does not prohibit the introduction of victim impact evidence during the sentencing phase of trial, as "[i]n the majority of cases, . . . [it] serves entirely legitimate purposes." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). However, it observed, "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id*. (citing *Darden*, 477 U.S. at

179-83). In *Byrd v. Collins,* the Sixth Circuit rejected a habeas petitioner's prosecutorial-misconduct claim based on the prosecutor's introduction of victim impact evidence during the guilt-phase closing argument, because, even if improper, the remarks were "relatively isolated, were not extensive, and were only a small part of a closing argument that focused heavily on summarizing the evidence presented at trial." *Byrd*, 209 F.3d at 532. The court also noted that the trial court instructed the jury that the closing arguments were not evidence, and the prosecutor began his closing argument by asking the jurors to bear that in mind. *Id.* at 533. In another case, *Beuke v. Houk*, 537 F.3d 618 (6th Cir. 2008), it found testimony about a victim's children was not constitutionally improper, as it was "minimal and largely insignificant" at less that one-half page of transcript testimony and "not inflammatory." *Id.* at 640.

Here, too, the remarks at issue were isolated – accounting for less than one page of the transcript – relatively insignificant, and not inflammatory. The judge also instructed the jury not to consider the closing argument as evidence (Doc. 117-5 (Trial Tr.) at 83), and a prosecutor reminded the jury of the instruction (*id*. at 119). The comments, therefore, cannot be said to have "rendered the entire trial fundamentally unfair." *Byrd*, 209 F.3d at 533 (internal quotation marks and citation omitted). The Ohio Supreme Court reasonably found no due process violation with regard to these comments.

*Derogatory comments regarding defense counsel*. McNeill asserts that the prosecutor also made improper comments about defense counsel during closing argument. (Doc. 144 at 78, 81.) He complains that the prosecutor accused counsel of: "playing fast and loose with the facts" (Doc. 117-5 (Trial Tr.) at 119); making an "absolute

misrepresentation" and advancing "theories . . . to create or fabricate doubt in this case" regarding fingerprint testimony (*id*. at 120); and "misrepresent[ing]" the coroner's testimony (*id*. at 121). Respondent counters that the statements, in context, were proper characterizations of defense counsel's arguments, made in rebuttal. (Doc. 141 at 117-18.)

*Darden* itself concerned comments the prosecution made in closing argument. The Court found some of the comments at issue "undoubtedly were improper." *Darden*, 477 U.S. at 180. Some implied that the death penalty would be the only guarantee against a future similar act; others incorporated the defense's use of the word "animal"; and several were offensive, reflecting an emotional reaction to the case. *Id*. But the Court concluded that in the broader context of the trial, the prosecutorial statements complained of did not deprive the petitioner of a fair trial. *Id*. at 181-83. It noted that the prosecutor's closing argument "did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Id*. at 182. Also, "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense." *Id*. The trial court also instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and the arguments of counsel were not evidence. *Id*. And the weight of the evidence against the petitioner was "heavy," the Court observed, including "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges," which "reduced the likelihood that the jury's decision was influenced by argument." *Id*. (internal quotation marks and citations omitted).

Here, the first two statements McNeill alleges were improperly derogatory fell

76

within permissible boundaries of rebuttal closing argument. The full context of the first comment complained of – that defense counsel was "playing fast and loose with the facts" – was:

> Well, let's just talk about a few things that just happened here. Mr. Nagy argued that Kimberly Sanford was jilted by the Defendant, and therefore you should view her testimony with distrust. I seriously doubt that any of you can recall any testimony or evidence that says that she was jilted by this man (indicating). There was none. But somebody is playing fast and loose with the facts.

(Doc. 117-5 (Trial Tr.) at 119.) Respondent explains that this statement was in direct response to defense counsel's statement in his closing argument that Kimberly Sanford "was also a former girlfriend who was jilted at some point by Freddie, and therefore has a reason, besides the consideration toward her fine, to come in here and not tell you the complete truth." (*Id*. at 95-96.) In fact, Sanford testified that sometime in the past, she and McNeill had dated for a few months but she ended the relationship, and they were "somewhat" in the process of reconciling at the time of the shooting. (Doc. 117-5 (Trial Tr.) at 4.) The prosecutor, therefore, was rebutting defense counsel's representation of trial evidence, which is not improper.

Similarly, the prosecutor's remarks about defense counsel's arguments concerning fingerprint testimony were permissible in context. The prosecutor's complete statement was:

> [Defense counsel is] telling you that Robert Rushinsky wiped out that car, wiped fingerprints clean. Now, the testimony of the witnesses was that he was running around trying to get help for his friend. But irrespective of that, [defense counsel] wants you to conclude that, from the one question that was asked to Sgt. Resendez, there were no prints in that car. That is an absolute misrepresentation. The question to Sgt. Resendez, which was proper, and which was correctly answered, was, no prints of evidentiary value were found. Now, that does not mean no prints were found. That means that there were no prints

77

that were legible that could be read were found.

(*Id*. at 120.)  Respondent points out that this portion of the prosecution's rebuttal responded to defense counsel's argument that Rushinsky wiped the car clean of fingerprints:  "I submit it's because [Rushinsky] wiped the car.  I submit that's an inference that can be drawn from the fact there were no prints, including his own, in the car." (*Id*. at 106.)  Sgt. Resendez testified, however, that there were no prints of any evidentiary value found in the vehicle, not that there were no prints found:  "Q.  No prints of any value were found?  A. That's correct." (*Id*. at 42.).  Again, therefore, the prosecutor's comments at issue rebutted defense counsel's misrepresentation of testimony and were not improper.

Finally, McNeill challenges the way the prosecutor described defense counsel's argument about the coroner's testimony in this passage of the prosecutor's rebuttal closing argument:

> Now, another claim that I think was a little fast and loose with what happened here is, Defense Counsel told you that Dr. Balraj said that the wound in this case was caused – or was consistent with someone being in the car.  I recall nothing about that.  I recall her saying the only thing she can say was it was a contact wound.  Period.  Not, "It was consistent with someone being in the car."  And from there he embarks on this speculation it was the passenger's side; it had to be on the other side of the car.  Well, his basic principle is wrong, is a misrepresentation to you, and I think you should think very carefully, before you start inferring these things, as to just what the evidence is you should start inferring things from.

(*Id*. at 120-21.)  Defense counsel had argued that Dr. Balraj "said, very significantly, . . . that it is consistent, these facts, with someone in the car doing the shooting, either in the back seat or the seat to the victim's left, since the victim was in the passenger's seat in this particular case." (*Id*. at 99.)  He then told the jury that they would "know that" if they "[p]ut that together" with other evidence, including photographs of the car after the shooting

showing the placement of blood inside the car.  (*Id*. at 99-100.)  Respondent does not specifically address this claim.

In this instance, McNeill is right that the prosecutor falsely accused defense counsel of misstating the evidence.  During defense counsel's cross-examination of Dr. Balraj, the following exchange took place:

> Q: Okay. So it is consistent with your findings, for example, that this gunshot may have occurred and may have been placed, the bullet in Blake Fulton's head, from an individual seated in the back seat of a car holding a gun in contact with that portion of his body; is that correct?
>
> A: Yes, it's consistent with that also.

(Doc. 117-4 (Trial Tr.) at 52.)  The prosecutor's comments, therefore – that defense counsel played "a little fast and loose" with Dr. Balraj's testimony and presented a theory that the victim was sitting in the passenger's seat that was "wrong" and a "misrepresentation" – were themselves misrepresentations of evidence.

As in *Darden*, however, this remark, while improper, did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181 (internal quotation marks and citation omitted).  In the broader context of the trial, it was an isolated comment that was responsive to, although mistaken about, defense counsel's argument.  It also was not overly heated rhetoric that might "result in inflamed passions" against McNeill, *id*. at 182; the prosecutor said defense counsel played "a little fast and loose, and he could not "recall" the testimony at issue.  In addition, the trial court instructed the jury that "closing arguments of Counsel are designed to assist you, but they are not evidence."  (Doc. 117-5 (Trial Tr.) at 135.)  Finally, similar to *Darden*, the State's case against McNeill was strong, including "overwhelming eyewitness and circumstantial

evidence to support a finding of guilt on all charges," which "reduced the likelihood that the jury's decision was influenced by argument." *Darden*, 477 U.S. at 182 (internal quotation marks and citations omitted).

Accordingly, the Ohio Supreme Court reasonably concluded that the prosecutor's remark about defense counsel's characterization of Dr. Balraj's testimony did not rise to the level of a due process violation. *See United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992) ("A prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth.").

### c.      cumulative impact

McNeill last argues that the Ohio Supreme Court's decision rejecting his prosecutorial-misconduct claims was contrary to Supreme Court precedent because it did not consider the cumulative effect of the allegedly improper conduct on the fairness of his trial.  (Doc. 144 at 85-88.)  But there can be no cumulative effect where there is only one instance of arguably improper conduct.

The Ohio Supreme Court analyzed each of McNeill's prosecutorial-misconduct claims and reasonably found no due process violation.  And "[p]articularly because the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations,' [this Court] ha[s] no warrant to set aside the [state court's] conclusion." *Parker*, 567 U.S. at 48 (quoting *Yarborough*, 541 U.S. at 664). McNeill's sixth and eighth grounds for relief are meritless.

**E.      Seventh and Twenty-Seventh Grounds for Relief:  *Suppressed Evidence***

McNeill claims in his seventh ground for relief that the prosecution violated his due

process rights by failing to disclose to the defense evidence that he alleges would have

undermined the credibility of the State's key witness, Robert Rushinsky, supported

McNeill's alibi, and provided a different theory of the crime.  (*See* Doc. 144 at 47-76.)

Specifically, McNeill alleges that prosecutors suppressed:  (1) an audiotape of Rushinsky's

first police interview, in which he initially failed to identify McNeill from a photo array, and

a corresponding police report regarding that interview; (2) an audiotape of Rushinsky's

second police interview showing the police coached him; (3) a police report containing the

two descriptions of the fleeing suspect; and (4) an audiotape of a police interview with a

witness who would have supported McNeill's alibi.  (*Id*. at 48-51.)  In his related twenty-

seventh ground, he argues that the prosecution permitted false testimony about that same

evidence.  (*See id*. at 140-53.)  Respondent argues these claims are procedurally defaulted

because the state court found they were not timely raised and/or meritless.  (*See* Doc. 141 at

97, 156.)

### 1.      *Brady v. Maryland* **and** *Napue v. Illinois*

In *Brady v. Maryland,* 373 U.S. 83 (1963), the Supreme Court held that a criminal

defendant's due process rights are violated if the prosecution suppresses favorable evidence

that is material to the defendant's guilt or punishment.  *Id.* at 87.  This duty to disclose

applies even though there has been no request by the accused and encompasses

impeachment as well as exculpatory evidence.  *Strickler v. Greene*, 527 U.S. 263, 280

(1999).  Nevertheless, a *Brady* violation will not result in a new trial for a criminal

defendant unless the court concludes that the improperly withheld evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

A related claim falling within the *Brady* disclosure doctrine arises when a state "knowingly use[s] false evidence, including false testimony, to obtain a tainted conviction . . . ." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To establish a due process violation based on the knowing use of perjured testimony, the petitioner must demonstrate that "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Id.* at 271; *see also Giglio v. United States*, 405 U.S. 150, 154 (1972).

### 2. Procedural History

McNeill's efforts to develop his *Brady* and *Napue* claims began twenty-three years ago – just a year after McNeill's trial – when his post-conviction counsel discovered a police report about his case in the court files of another lawsuit. Below is an account of the claims' long and complex procedural history.

*McNeill's trial.* Robert Rushinsky was the State's key witness at McNeill's trial. Rushinsky testified that on the evening of May 13, 1994, he and Fulton each had a hit of crack cocaine and decided to buy some more. (Doc. 117-4 (Trial Tr.) at 58.) Fulton drove around Lorain, with Rushinsky in the passenger seat, until he came across McNeill, who offered to sell them some. (*Id.* at 58-61.) Rushinsky had bought cocaine from McNeill before. (*Id.* at 61.) McNeill joined them and they drove off. (*Id.* at 62.) McNeill then pointed a gun at them, Rushinsky attested, and demanded they give him twenty dollars. (*Id.*) But Fulton refused and Rushinsky had no cash. (*Id.* at 63-64.) Rushinsky testified

that a heated argument between Fulton and McNeill ensued, culminating in McNeill

shooting Fulton point-blank in the head with Rushinsky still sitting next to him.  (*Id*. at 65-

66.)  Rushinsky was the sole adult witness to the crime (four young children were playing

nearby).  *McNeill*, 83 Ohio St. 3d at 439.  Rushinsky identified McNeill in court.  (Doc.

117-4 (Trial Tr.) at 61).

　　After Rushinsky's direct examination, in accordance with then-existing Ohio

Criminal Procedure Rule 16(B)(1)(g),[14] defense counsel requested an in camera inspection

of "any statements, written, oral, that he may have made to [a] law enforcement agency" to

---

[14] At the time of McNeill's trial, Ohio Criminal Procedure Rule 16(B)(1)(g) and (2)
provided:

　　(B) Disclosure of evidence by the prosecuting attorney

　　(1) Information subject to disclosure.

　　　　* * *

　　(g) In camera inspection of witness' statement.  Upon completion of a witness' direct
　　examination at trial, the court on motion of the defendant shall conduct an in camera
　　inspection of the witness' written or recorded statement with the defense attorney and
　　prosecuting attorney present and participating, to determine the existence of inconsistencies,
　　if any, between the testimony of such witness and the prior statement.  If the court determines
　　that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-
　　examination of the witness as to the inconsistencies.  If the court determines that
　　inconsistencies do not exist the statement shall not be given to the defense attorney and he
　　shall not be permitted to cross-examine or comment thereon.

　　Whenever the defense attorney is not given the entire statement, it shall be preserved in the
　　records of the court to be made available to the appellate court in the event of an appeal.

　　(2) Information not subject to disclosure.  Except as provided in subsections (B)(1)(a), (b), (d),
　　(f), and (g), this rule does not authorize the discovery or inspection of reports, memoranda,
　　or other internal documents made by the prosecuting attorney or his agents in connection with
　　the investigation or prosecution of the case, or of statements made by witnesses or prospective
　　witnesses to state agents.

Rule 16(B)(1)(g) has since been amended.  *See* Ohio R. Crim. P. 16(B).

83

determine if any inconsistencies existed between his testimony and the prior statement. (*Id.* at 68.) The prosecutor informed the court and defense counsel that the State "ha[d] a taped statement" from Rushinsky taken the night of the shooting. (*Id.* at 68, 71.) The trial court then conducted an in camera hearing regarding the audiotape.

Before the tape was played, the judge asked counsel for both parties if they "agree[d] that if the cassette is marked there [was] no need to have the court reporter attempt to transcribe what is on the tape[,]" or if they wanted the tape transcribed. (*Id.* at 70.) The prosecutor replied, "I don't know that it's necessary to put my tape in evidence, is it? Because someone made a motion?" (*Id.* at 70-71.) The judge responded, "No." (*Id.* at 71.) And defense counsel stated, "Not at this point." (*Id.*) After that discussion, the transcript indicates "a portion of the cassette tape was played." (*Id.* at 71.) The prosecutor then said, "I think that is it, but I want to ask Ricky." (*Id.*) After a brief discussion of when the recorded interview occurred, the transcript indicates that the tape was played again "in its entirety." (*Id.*) The court did not submit the tape as an exhibit. (*See* Doc. 118-1 at 469-70 (List of Trial Exhibits).)

Afterward, defense counsel identified several inconsistencies between Rushinsky's testimony and the recorded statement, including the fact that Rushinsky testified that he knew McNeill before the shooting but told the police in the interview that he did not; and that he testified that he had purchased drugs from McNeill before the shooting but told police he had not. (Doc. 117-4 (Trial Tr.) at 72-73.) The judge ruled that the inconsistencies were sufficient to allow the defense to cross-examine Rushinsky on the statement if it wished. (*Id.* at 73-74.) Defense counsel's subsequent cross-examination of

84

Rushinsky included several questions about the recorded statement and its inconsistencies with his testimony. (*See, e.g., id.* at 77, 84-85.) But he did not refer to any photo lineup or otherwise challenge Rushinsky's in-court identification of McNeill.

In addition, prior to trial, defense counsel had discovery motion requesting that the State produce in discovery "[a]ny books, papers, documents, photographs, tape recordings, tangible objects . . . or copies or portions, thereof, which [were] material to the preparation of Defendant's defense[,] . . . [and] [a]ll evidence known or which may become known to the Prosecuting Attorney favorable to the defendant or material to either his guilt or punishment." (Doc. 116-1 at 23.) The State did not provide in response to that request any written or recorded statements from Rushinsky or any favorable evidence supporting McNeill's alibi. Defense counsel also filed a pretrial "Motion for any Exculpatory Evidence" seeking "any exculpatory evidence that will tend to show that the crime was not committed as outlined in the Bill of Particulars." (*Id.* at 68.) The State responded that it was "not in possession of any evidence that tends to show the crime was not committed as outlined in the Bill of Particulars." (*Id.* at 103.)

*Direct appeal.* During McNeill's direct appeal, in July 1996, McNeill's appellate counsel filed a motion asking the court to order the State to "disclose to Appellant the taped statement made by . . . Rushinsky to law enforcement and to supplement the record with that statement." (*Id.* at 312-19.) Attached to that motion was a letter from McNeill's counsel to a Lorain County prosecutor requesting a copy of the tape. (*Id.* at 319.) The State did not respond to the motion, and the court denied it. (*Id.* at 536.)

*State Post-Conviction Proceedings.* About a year after McNeill's trial, in August

1996, McNeill's post-conviction counsel sent a public records request to the Lorain Police Department ("LPD") seeking all records it possessed relating to McNeill and the Fulton murder case. (Doc. 116-3 at 530-31.) The LPD produced responsive records and represented to McNeill's counsel that it had produced all responsive documents. (*See id.* at 565 (Letter from Defense Counsel to LPD).)

According to McNeill, his post-conviction counsel also examined the record of a lawsuit that Blake Fulton's family brought against the State of Ohio for reparations in the Ohio Court of Claims. (*See* Doc. 137 at 57-58.) In it, they found two previously undisclosed police reports. One report noted that during the department's first interview with Rushinsky, conducted the night of the shooting, Rushinsky failed to identify McNeill from an initial array of Polaroid photographs, although he positively identified him later in the interview from a second array of LPD mugshots. (Doc. 116-3 at 527 (Rushinsky Police Report).)[15] The other reported "two descriptions of the suspect fleeing" the crime scene.

---

[15] The report stated:

> Rushinsky was shown a photo array of poloroid photos, which included Freddie McNeill, upon looking at these photographs he failed to pick out anybody. Upon being shown a photo array of Lorain Police Department numbered mug shots the following actions occurred. After viewing the first two photos he indicated that they were not the suspect.

> Upon looking at the third photo, that being of Freddie McNeill he positively stated that this was the same male that they had picked up and had shot Blake Fulton. He was shown two more photographs and re-stated that male number three.... FREDDIE MCNEILL was the person responsible.

(Doc. 116-3 at 527 (ellipses in original).)

(*Id.* at 528 (Second-Suspect Police Report).)[16]

Soon after, in September 1996, McNeill filed a post-conviction petition in the state trial court, asserting, among other things, *Brady* claims based on the two police reports, which he asserted were never disclosed to defense counsel at trial but were critical to his defense. (*Id.* at 137-39.) McNeill argued defense counsel could have used the report regarding Rushinsky's first interview to undermine Rushinsky's in-court identification of him. (*Id.* at 138.) The report also included statements Rushinsky made during the interview that McNeill claimed were inconsistent with his trial testimony – such as the color of the gun used, his and Fulton's drug use the night of the murder, and the nature of his relationship with McNeill – and could have been used to further impeach Rushinsky's credibility. (*Id.*) McNeill requested discovery on the claim. (*Id.* at 139.) McNeill further asserted a claim in his post-conviction petition that the State violated his due process rights when it "interfered with [his] attempt to investigate and prepare" his petition, including his *Brady* claim. (*Id.* at 139-40.) He again requested more discovery. (*Id.*)

The trial court denied McNeill's petition and requests for discovery and evidentiary hearing in January 1998. (Doc. 116-4 at 155-62.) It rejected his *Brady* claim on the grounds that a police report is not a "statement" that had to be disclosed under Rule 16(B)(1)(g), and further, prosecutors played for defense counsel at trial a tape recording the Rushinsky statement summarized in the report, as required by that rule. (*Id.* at 156.) The court similarly rejected McNeill's *Brady* claim based on the police report of a second

---

[16] The report stated: "Units first on scene gave out two descriptions of the suspect fleeing the area one being a black male wearing peach colored pants and a read [*sic*] shirt, and the other being a black male wearing blue jeans and gray sweatshirt." (Doc. 116-3 at 528.)

possible suspect. (*Id.* at 156-57.) It found the information was "not exculpatory or even relevant" to the case, as the police investigated the information and determined that the person identified had nothing to do with the crime. (*Id.*)

The court of appeals affirmed the trial court's judgment denying McNeill's *Brady* claims in March 2000. *State v. McNeill*, 137 Ohio App. 3d 34, 41 (Ohio Ct. App. 2000).[17] It concluded that "none of [McNeill's new] evidence even suggested that the state did anything improper[,]" and that "[m]oreover, he failed to demonstrate that he could not have raised this issue at trial or on appeal." *Id.* The Ohio Supreme Court declined jurisdiction over McNeill's appeal of the appellate court's judgment. *State v. McNeill*, 89 Ohio St. 3d 1453 (Ohio 2000).

*Federal Habeas Corpus Proceedings.* In December 2002, McNeill filed in this Court a petition for writ of habeas corpus. (Doc. 21.) As his seventh ground for relief, he asserted the State violated his constitutional rights under *Brady* by failing to disclose, among other things, the police report on the Rushinsky interview, which noted Rushinsky's failure to identify McNeill from a photo line-up the evening of the shooting and Rushinksy's statements that contradicted his trial testimony about the color of the gun, his and Fulton's drug use the night of the murder, and his relationship with McNeill. (Doc. 21-1 at 22-23.)

In April 2005, McNeill filed a motion for discovery and evidentiary hearing,

---

[17] The appellate court reversed the trial court's judgment on two of McNeill's claims of ineffective assistance of counsel, because those claims were not facially baseless and required a review of the record, but the trial court had ruled on them while the trial record remained in the Ohio Supreme Court's possession in connection with McNeill's direct appeal. *McNeill*, 137 Ohio App. 3d at 42-43.

requesting, among other things, a deposition of the LPD records custodian to determine if the department had disclosed all records he had previously requested.  (Doc. 51 at 18-19.)  This Court denied that request on the ground that it was unnecessary, because McNeill already had obtained the LPD's complete file on his case during his state post-conviction proceedings and did not demonstrate good cause for further discovery other than "mere suspicion."  (Doc. 57 at 9-10.)

McNeill renewed his discovery motion a year later, in April 2006, including his request for the LPD records deposition.  (Doc. 68 at 16-18.)  This time, he was more specific in explaining why his request was justified, including the circumstances surrounding his prior requests of the LPD and his discovery of the police report of the Rushinsky interview.  (*Id*. at17.)  This Court found McNeill's explanation sufficient cause to suspect the LPD had not provided him with its complete case file and granted his request to conduct the LPD records deposition.  (Doc. 80 at 7-8.)

In March 2008, McNeill's counsel advised the Court in a "Status Report Regarding Discovery" that the LPD had produced its file on the Fulton murder.  (Doc. 82 at 1.)  However, they explained, when counsel went to the LPD to compare the produced documents to the original records, they discovered eight audiotapes in the file that were not previously produced.  (*Id.*)  McNeill's counsel stated that the department "thereafter provided the undersigned counsel with copies of said tapes," and they were "reviewing them with . . . McNeill."  (*Id*.)  Counsel further advised that they had told Respondent about the tapes and promised to provide her with copies.  (*Id.*)

In December of that year, McNeill filed a motion with this Court requesting funds to

employ an investigator to further develop his *Brady* claims.  (Doc. 87.)  He explained that

two of the audiotapes discovered in the LPD file were not disclosed to his trial counsel.  (*Id.*

at 6.)  One of those tapes recorded the LPD's first interview of Rushinsky, conducted the

evening of the shooting.  It records the following exchange between a detective and

Rushinsky regarding the first photo array, which occurred at the beginning of the interview,

right after Rushinsky identified himself:

> Q:      Did you see the guy who did this?
>
> A:      Yeah.
>
> Q:      I want you to look at some pictures here.
>
> A.      No.  No.  No.  No.  No.
>
> Q:      Not this guy, not this guy, not this guy, not this guy.  Look at them good.
>
> A.      No.

(Doc. 133-2 (Jt. Submission of Transcripts / Rushinsky First Interview Tape) at 1.)  Near the

end of the interview, the detective showed Rushinsky a second set of photographs:

> Q:      . . . Show you these pictures.  How's that look?  How's that look?
>
> A:      That's him.
>
> Q:      Sure?
>
> A:      Yep.
>
> Q:      How's that look?  How's that look?
>           (Door opens, far away conversation.)
>           (Door opens.)
>
> Q:      That picture you picked out you're sure that's him?  That ain't him?
>
> A:      No.  As far as I can tell it doesn't look like him.

Q:     Okay.  But the other one you're hundred percent positive.  Okay.

A:     As sure as I can be, yes.

Q:     Yeah.

(*Id*. at 3.)

The other tape contained a police interview with Marko Roseboro,[18] conducted on April 12, 1995, which McNeill argued may have provided an alibi and/or established ineffective assistance of counsel in failing to investigate an alibi.  (*Id*.)  Roseboro told police that he was with Rushinsky the evening of Fulton's shooting, "[j]ust riding around together" in "[w]hoever's car."  (Doc. 133-1 (Jt. Submission of Transcripts / Roseboro Tape) at 1.) He also said that "[m]aybe" it was "possible that when [he was] riding around with McNeill [he] picked up a guy by the name of Blake Fulton[,]" although he denied knowing Fulton. (*Id*. at 2.)

The Court granted McNeill's request for funds for an investigator in June 2009. (Doc. 90.)

*Motion for New Trial.*  In September 2011, McNeill filed with the state trial court a motion for leave to file a motion for new trial raising his *Brady* claims based on the police report of the Rushinsky interview and the Rushinsky and Roseboro audiotapes.  (Doc. 118-1 at 10-13.)  In the attached instanter motion for new trial, he argued that if prosecutors had disclosed to defense counsel the newly discovered Rushinsky interview tape and police report showing Rushinsky failed to identify McNeill from a photo array, they could have used it to cross-examine Rushinsky and undermine his identification of him.  (*Id*. at 15.)

---

[18] Roseboro's name is sometimes incorrectly spelled Marco Roseborough in the record.

And the audiotape of the Roseboro interview, he asserted, would have supported his alibi at trial.  (*Id*.)  McNeill also claimed the suppressed evidence demonstrated that the prosecution violated his due process rights under *Napue* by allowing Rushinsky to falsely identify him at trial.  (*Id*. at 20-21.)

McNeill attached as support for his motion an affidavit of his trial counsel, Joseph Grunda.  (*Id*. at 25 (Grunda Aff.).)  In it, Grunda averred that the State never informed him that Rushinsky had initially failed to identify McNeill, and if he had been so advised, he would have "vigorously cross-examined him on that point."  (*Id*.)  He further stated that the taped interview of Rushinsky that the State provided at trial "ma[de] no mention of the fact that he was unable to identify anyone from a photo array[,] [n]or was [he] ever advised that in fact there were two taped interviews of Mr. Rushinsky."  (*Id*.)  And he attested that the State never told him about the taped Roseboro interview either.  (*Id*.)

McNeill did not submit to the state court copies of the audiotapes as exhibits to his motion.  Instead, he informed the court in his motion that "[t]he original of the audio tape is currently in possession of the State but a defense copy can be provided at hearing hereof by the defense."  (*Id*. at 18.)  This proffer is consistent with Ohio Criminal Procedure Rule 33(A)(6), which provides that "[w]hen a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given."  Ohio R. Crim. P. 33(A)(6).

In February 2012, McNeill filed a motion asking this Court to stay his habeas action and hold it in abeyance pending the exhaustion of the *Brady* and *Napue* claims raised in his

state-court motion for a new trial. (Doc. 96.) The Court granted the motion. (Doc. 99.) It found McNeill established good cause for his failure to exhaust his claims in state court, as he had diligently sought information regarding these claims since 1996 and only obtained the audiotapes in 2008 after this Court ordered discovery, and the claims based on the Rushinsky tape were not plainly meritless.[19] (*Id*. at 6-9.)

The state courts denied McNeill's motion for leave to file a motion for new trial. The trial court first found the motion untimely, as McNeill did not adequately explain the reason for his delay in seeking a new trial. (Doc. 118-1 at 229-30.) It then concluded that, in any event, the new evidence did not establish a "strong probability that it would change the result in a new trial." (*Id*. at 232.) It reasoned:

> The trial transcript herein is replete with numerous witnesses identifying the Defendant as the shooter as well as other testimony regarding him threatening his ex-girlfriend earlier in the day with a gun matching the description of the gun used in the murder. Specifically, Robert Rushinsky identified the Defendant in Court, indicated he had prior involvement with Defendant, that he knew where the Defendant lived from that prior involvement, and that the murder occurred in front of Defendant's house. Trial Transcript volume III at pp. 584-591, 607-609, 623-625. Further, four children who witnessed the incident all testified and identified the Defendant as the one involved in the shooting. *Id*. at pp. 687-779. Some of the children were cross examined regarding their inability to identify Defendant in a photo lineup. *Id*. at pp. 743-745, 752. The jury was obviously not persuaded that the failure to identify in a photo lineup ultimately made these witnesses unable to identify the Defendant.

(*Id*. at 231-32.)

McNeill appealed the trial court's judgment. He argued that the trial court violated his due process rights when it *sua sponte* dismissed his motion without notifying all parties.

---

[19] The Court found, for purposes of the motion to stay, that McNeill's *Brady* claim based on the Roseboro tape was plainly meritless, because McNeill knew at trial that Roseboro, a defense witness, had information relevant to his alibi defense and he could have obtained any information he sought to support his alibi from Roseboro himself. (Doc. 99 at 9.)

(*Id.* at 285.)  He requested an evidentiary hearing, or at a minimum, a "remand for additional proceedings" to permit him "to respond and be heard on the trial court's diligence finding . . . ."  (*Id.* at 298.)  The state appellate court affirmed the trial court's decision, agreeing with McNeill that the State "did not challenge [his] request" on the basis of diligence, but holding that parties must respond to all potential arguments and McNeill did not adequately explain the cause of his delay in bringing the motion.  (*Id.* at 361-64.)  The court questioned, for instance, why, when McNeill received the tapes by March 2008, "it took him until 2011 to obtain an affidavit from his trial counsel [regarding the tapes] or why it took him another three months after obtaining the lawyer's affidavit to file his application for leave."  (Doc. 118-1 at 364.)  The Ohio Supreme Court declined jurisdiction over McNeill's appeal of that ruling.  (*Id.* at 458, 467.)

Having exhausted his new *Brady* and *Napue* claims in state court, McNeill moved to reinstate his case on this Court's docket in August 2017.  (Doc. 107.)  On March 2, 2018, McNeill filed a Motion to Amend Habeas Petition (Doc. 120) and Motion to Expand the Record (Doc. 119).  He sought to supplement his *Brady* claim and add the *Napue* claim based on the newly discovered audiotapes, including a third audiotape, this one recording a second police interview of Rushinsky during which a detective corrects Rushinsky's description of the hat McNeill allegedly wore the night of the shooting.  (Doc. 120 at 4; *see also* Doc. 133-3 (Jt. Submission of Transcripts / Second Rushinsky Interview Tape) at 1.)[20]

---

[20] McNeill cited the following exchange during this second police interview of Rushinsky:

A:  . . . I remember the hat, the green hat.
Q: (By Detective) That hat ain't green.
A: It's like a khaki color, isn't it?
Q: Yeah.  Like a beige color.

McNeill also moved to expand the record to include evidence that supports those claims.

(Doc. 119 at 1.) Respondent opposed both motions. (Docs. 121, 125.) On July 9, 2018, the

Court granted McNeill's motions. (Doc. 128.)

### 3. Section 2254(e)(2)

In ruling on McNeill's motion to expand the record, this Court considered whether

McNeill had met the standards of AEDPA's § 2254(e)(2), which generally governs habeas

courts' ability to hold evidentiary hearings but also applies to the introduction of new

evidence without an evidentiary hearing, such as when the petitioner seeks to introduce new

evidence based on a motion to expand the record. *Holland v. Jackson*, 542 U.S. 649, 653

(2004). Section 2254(e)(2) precludes an evidentiary hearing "[i]f the applicant has failed to

develop the factual basis of a claim in State court proceedings" unless the applicant satisfies

certain conditions.[21] 28 U.S.C. § 2254(e)(2).

Under AEDPA, therefore, a prisoner may introduce new evidence in support of a

---

A: Like a lighter of that.

(Doc. 133-3 (Jt. Submission of Transcripts / Second Rushinsky Interview Tape) at 1.) Although McNeill referred generally to "audiotapes" in his motion for new trial in state court, he did not assert a separate *Brady* claim based on the audiotape of Rushinsky's second police interview; nor did Grunda address the contents of that tape and the alleged coaching in his affidavit.

[21] Those conditions are:

    (A)    the claim relies on –
        (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and
    (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

claim in the district court "only if [the prisoner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed in § 2254(e)(2) were met." *Holland*, 542 U.S. at 652-53. A prisoner is at fault in failing to develop the evidence if there is a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *(Michael) Williams v. Taylor*, 529 U.S. 420, 432 (2000). The required diligence is "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id*. at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id*. at 437.

As the Supreme Court has explained, defendants are not required to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004). Moreover, § 2254(e)(2) was not intended to bar claims that the defense diligently pursued but that remained undeveloped in state court because of the prosecution's concealment of pertinent facts. *(Michael) Williams*, 529 U.S. at 434; *see also Jaramillo v. Stewart*, 340 F.3d 877, 882 (9th Cir. 2003); *D'Ambrosio v. Bagley*, 2006 WL 1169926, at *18; *Albrecht v. Horn*, 314 F. Supp. 2d 451, 479 n.30 (E.D. Pa. 2004) (each finding that Section 2254(e)(2) did not bar an evidentiary hearing on the petitioner's *Brady* claims where the evidence at issue was unavailable to the petitioner until the federal court granted habeas discovery).

Here, McNeill tried to obtain a copy of the Rushinsky interview tape since 1996 and found it in March 2008 only after this Court granted him discovery. In those twelve years of repeated requests for the tape and other police records, the State never voluntarily

produced any of the tapes now at issue. After finding the tapes, McNeill moved for, and this Court granted in June 2009, funds for an investigator to further develop his *Brady* claims. In September 2011, he initiated new state post-conviction proceedings, raising a *Brady* claim based on the Rushinsky and Roseboro tapes and offering to present the tapes at an evidentiary hearing in accordance with state procedural rules. While that last twenty-seven-month period is a significant amount of time in which to investigate these claims and prepare papers for a new-trial motion, in the context of defense counsel's twelve-year effort to obtain a copy of the tapes and develop the claims based on them, this Court found that McNeill made "a reasonable attempt, in light of the information available at the time, to investigate and pursue [the] claims in state court." *(Michael) Williams*, 529 U.S. at 435.

McNeill, therefore, has demonstrated the requisite diligence in attempting to develop the factual basis of his *Brady* and *Napue* claims and in presenting the audiotapes supporting those claims in state court, and the Court will consider the Rushinsky and Roseboro audiotapes in addressing his *Brady* and *Napue* claims without satisfying § 2254(e)(2)'s conditions. *See Getsy v. Mitchell*, 495 F.3d 295, 310 (6th Cir. 2007) ("Getsy sought to develop evidence regarding his judicial-bias claim both at trial and in his postconviction proceedings in state court. He has thus demonstrated diligence in accordance with § 2254(e)(2)."); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) ("In the case before us, petitioner pursued his ineffective assistance of appellate counsel claim with proper diligence, raising it first—albeit prematurely—in his petition for post-conviction relief and then in his motion for delayed reconsideration. Both of these pleadings requested an evidentiary hearing, which was never afforded by the Ohio courts. Consistent with *Williams*

*v. Taylor*, therefore, we conclude that petitioner is not precluded from an evidentiary

hearing as he exercised the necessary diligence in attempting to establish the factual record

in state court."); and *Hoffner v. Bradshaw*, No. 3:05 CV 687, 2007 WL 3171631, at * 3

(N.D. Ohio Oct. 29, 2007) (Gwin, J.) ("Petitioners who request an evidentiary hearing in the

appropriate state court proceedings are sufficiently diligent, even when the state court fails

to grant the request.") (citing *Greer*, 264 F.3d at 681)).

### 4. Procedural Default

#### a. *Brady* and *Napue* claims based on evidence regarding Rushinsky and Roseboro police interviews

McNeill, however, has an additional hurdle to overcome before this Court can reach

the merits of his *Brady* and *Napue* claims. Respondent argues that the *Brady* and *Napue*

claims he asserted in his motion for leave to file a motion for new trial – based on the

Rushinsky and Roseboro interview tapes and the police report regarding the Rushinsky

interview – are procedurally defaulted because the last state court to review the claims, the

state appellate court, dismissed them as untimely. (Doc. 141 at 100-02, 157.)

Ohio Criminal Procedure Rule 33(B) requires that a defendant file a motion for new

trial based on newly discovered evidence within 120 days after the verdict was rendered,

unless he can show by clear and convincing evidence that he was unavoidably prevented

from discovering the evidence during that time period. Ohio R. Crim. P. 33(B). Although

Rule 33(B) does not provide a specific time limit for filing a motion for leave, a majority of

Ohio appellate courts had applied a reasonableness standard, requiring that defendants file a

motion for leave to file a motion for new trial within a reasonable time after discovering the

new evidence. *See, e.g., State v. Thomas*, 93 N.E.3d 227, 229-30 (Ohio Ct. App. 2017);

*State v. Seal*, 75 N.E.3d 1035, 1039 (Ohio Ct. App. 2017). The court of appeals in

McNeill's case found that McNeill failed to file his application for leave within a reasonable

time after discovering the allegedly suppressed audiotapes. (Doc. 118-1 at 361-64.)

McNeill argues that this reasonable-time rule is not an adequate and independent

state ground upon which to bar federal habeas review, either generally or as applied in his

case. (Doc. 144 at 68-71, 147-49.) The Sixth Circuit has established a four-part test to

determine when a habeas claim is defaulted because of a prisoner's failure to observe a state

procedural rule:

> First, the federal court must determine whether there is a state procedural rule
> that is applicable to the petitioner's claim and whether the petitioner failed to
> comply with that rule. Second, the federal court must determine whether the
> state courts actually enforced the state procedural sanction – that is, whether the
> state courts actually based their decisions on the procedural rule. Third, the
> federal court must decide whether the state procedural rule is an adequate and
> independent state ground on which the state can rely to foreclose federal review
> of a federal constitutional claim. Fourth, if the federal court answers the first
> three questions in the affirmative, it would not review the petitioner's
> procedurally defaulted claim unless the petitioner can show cause for not
> following the procedural rule and that failure to review the claim would result
> in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin v. Smith*, 785 F.2d 135,

138 (6th Cir. 1986) (further citations omitted).

The state appellate court's decision satisfies the first two steps of the *Maupin* test. It

found that McNeill filed his motion for leave to file a motion for new trial more than sixteen

years after the jury's verdict, well beyond Rule 33(B)'s 120-day time limit. (Doc. 118-1 at

361.) And it found that McNeill was not entitled to file a delayed motion for new trial

because he waited more than three years after discovering the tapes to file his motion for

leave, which it considered an unreasonable delay. (*Id*.) Further, the appellate court

99

enforced this timeliness requirement, dismissing McNeill's appeal on that ground. (*Id*. at 364.)

McNeill focuses on *Maupin*'s third prong, arguing that the reasonableness standard the state court applied under Rule 33(B) is not an adequate and independent state ground on which to foreclose habeas relief, because it is not "'firmly established and regularly followed.'" (Doc. 144 at 69 (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)).) He asserts that "it is not clear" that every Ohio appellate district has adopted the rule, and the Ohio Supreme Court "does not appear to have endorsed" it, although two of the court's justices recently cited it with approval in *State v. Apanovitch*, 155 Ohio St. 3d 358, 370-71 (Ohio 2018) (O'Donnell, J., concurring in part and dissenting in part, to which O'Connor, J., concurs). (Doc. 144 at 70.)

 McNeill, however, does not cite one Ohio court rejecting this reasonable-time requirement under Rule 33(B). Indeed, less than a year after the appellate court issued the opinion at issue here, another Ohio appellate court observed that all but two out of Ohio's twelve appellate districts apply the rule. *Thomas*, 93 N.E.3d at 229-30 (listing cases). That court explained that by discouraging defendants from waiting to move for leave while the evidence against him dissipates or disappears, the reasonable-time requirement is consistent with criminal rules and advances the stated objectives of the rules in securing the speedy administration of justice and eliminating unjustifiable delay. *Id*. at 230. Moreover, the Supreme Court has held that a state procedural "rule can be 'firmly established' and 'regularly followed,' . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Martin*, 562 U.S. at 316

(internal quotation marks and citation omitted).

Many federal courts have found the reasonableness standard under Ohio Criminal Procedure Rule 33 an adequate and independent ground on which to find a federal habeas claim procedurally defaulted. *See, e.g., Davis v. Bradshaw*, No. 1:14 CV 2854, 2016 WL 8257676, at * 39-40 (N.D. Ohio June 16, 2016); *Veliev v. Warden, Chillicothe Corr. Inst.*, No. 2:12 CV 346, 2014 WL 4805292 at *11–12 (S.D. Ohio Sept. 26, 2014); *Moore v. Brunsman*, No. 08 CV 2895, 2010 WL 425055, at *15 (N.D. Ohio Jan. 26, 2010). And McNeill does not identify any authority to the contrary. This Court finds, therefore, that Rule 33(B) satisfies *Maupin*'s adequate-and-independent requirement.

Alternatively, McNeill contends that the state court's procedural ruling dismissing his delayed application for new trial should be disregarded either because it misapplied the procedural bar under *Richey v. Bradshaw*, 498 F.3d 344, 359-60 (6th Cir. 2007), or was unconstitutional and "exorbitant" under *Lee v. Kemna*, 534 U.S. 362 (2002), both discussed above. (Doc. 144 at 70-73.) McNeill claims this is an exceptional case because the trial court raised the issue of delay *sua sponte* without giving him the opportunity to brief or argue the issue. (Doc. 144 at 70-71.) But he cites no authority for this position, or otherwise demonstrates that the state appellate court's application of Rule 33 is beyond the norm or contrary to the holdings of the Ohio Supreme Court. And this Court must defer to state courts' interpretations of its own procedural rules. *See Warner v. Zent*, 997 F.2d 116, 133 (6th Cir. 1993) ("On habeas review, we are bound state court interpretations of state criminal law except in extreme circumstances where it appears that the interpretation is an obvious subterfuge to evade consideration of a federal issue.") (citing *Mullaney v. Wilbur*,

421 U.S. 684, 690–91, n.11 (1975)); *Vance v. Scutt*, 573 Fed. Appx. 415, 418-19 (6th Cir. 2014) ("Timeliness is not a simple question of fact that requires nothing more than counting days on a calendar; rather, it is a matter of state procedural law . . . . We do not meddle with state court decisions on state procedural issues in habeas. We are bound by the state court's determination of its own law.") (internal quotation marks and citations omitted).

Accordingly, McNeill's *Napue* and *Brady* claims based on the audiotapes of police interviews of Rushinsky and Roseboro and the police report regarding the Rushinsky interview are procedurally defaulted. McNeill again asserts no cause and prejudice to excuse the default but claims he is actually innocent, which, as explained above, this Court rejects. (Doc. 144 at 73-76, 151-53.)[22]

### b. evidence regarding potential second suspect

Respondent does not contend that McNeill's *Brady* claim based on the LPD report identifying a potential second suspect is procedurally defaulted. As explained above, the last state court to review that claim was the state appellate court on post-conviction review, which concluded that "none of [McNeill's new *Brady*] evidence even suggested that the state did anything improper[,]" and that "[m]oreover, [McNeill] failed to demonstrate that he could not have raised this issue at trial or on appeal." *McNeill*, 137 Ohio App. 3d at 41. Respondent states that by evaluating the *Brady* evidence, the appellate court rejected the claim on the merits. (Doc. 141 at 110.) This Court finds it clear that the state court found

---

[22] McNeill concedes that the State's suppression of the alleged *Brady* material cannot establish cause and prejudice for his subsequent default of the claims asserted in his motion for leave to file a motion for new trial. *See Jells v. Mitchell*, 538 F.3d 478, 503 (6th Cir. 2008) ("Jells is not able to demonstrate cause for not filing for relief under Ohio Rev. Code § 2953.23(A) or Ohio R. Crim. P. 33(A) after obtaining the withheld information.").

McNeill's *Brady* claims barred by the doctrine of *res judicata*, based on its observation that McNeill did not show that he could not have raised the issue at trial or on direct appeal.

It is unclear, however, whether the state court's determination that McNeill's *Brady* evidence did not show prosecutorial misconduct constituted a resolution of the merits of the claims or a conclusion that the evidence was insufficient to overcome the *res judicata* bar from post-conviction review – or both. But even if the appellate court did adjudicate the merits of the claim, a state court's alternative merits analysis does not excuse a procedural default when the state court clearly and expressly relied on a procedural bar. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("Moreover, a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); *Scott v. Mitchell*, 209 F.3d 854, 865 (6th Cir. 2000) ("*Harris* does not preclude a finding that the state procedural rule was actually enforced where the state court decision also relies on an alternative ground."). McNeill's *Brady* claim based on the second-suspect police report, therefore, is procedurally defaulted. However, Respondent has not asserted this procedural-default defense, and it is therefore waived. *See Trest v. Cain*, 522 U.S. 87, 89 (1997) ("[P]rocedural default is normally a defense that the State is obligated to raise and preserv[e] if it is not to lose the right to assert the defense thereafter.") (internal quotation marks and citations omitted).

### 5. Merits Analysis

#### a. *Brady* claims

Even if McNeill's *Brady* claims were all properly preserved for federal habeas review, McNeill would not be entitled to relief. In order to establish a *Brady* violation, a petitioner must satisfy three requirements: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler,* 527 U.S. at 281-82.

To meet the suppression requirement, the petitioner must show that the evidence was in the prosecution's exclusive control. *Cone v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). There is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source because in such cases there is really nothing for the government to disclose." *Id.* at 344 (internal quotation marks and citations omitted).

Evidence is considered to have exculpatory or impeachment value if it "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441.

"Prejudice (or materiality) in the *Brady* context is a difficult test to meet." *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002). Evidence is "material" when there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Smith v. Cain*, 565 U.S.

73, 75-76 (2012) (quoting *Kyles,* 514 U.S. at 434 (internal quotation marks omitted)).

The Court will examine each of McNeill's *Brady* claims individually, then consider the cumulative impact of any *Brady* material. *See Kyles,* 514 U.S. at 436-37 and n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately . . . .").

In addition, this Court will review McNeill's *Brady* claims based on the Rushinsky and Roseboro interview tapes and Rushinsky-related police report *de novo,* since the last state court to review the claims found them procedurally barred as untimely and did not address their merits. *See, e.g., Robinson v. Howes,* 663 F.3d 819, 823 (6th Cir. 2011) ("Claims that were not 'adjudicated on the merits in State court proceedings' receive the pre-AEDPA standard of review: de novo for questions of law (including mixed questions of law and fact), and clear error for questions of fact."). As to McNeill's *Brady* claim regarding the second-suspect police report, as stated above, it is unclear whether the last state court to review that claim, the court of appeals on post-conviction, adjudicated the claim on the merits. If it did, AEDPA deference would apply. *See, e.g., Gumm v. Mitchell*, 775 F.3d 345, 362 (6th Cir. 2014) (" This Court and others have held that where a state court decides a petitioner's claim on alternative grounds, one on the merits and the other on a procedural bar ruling, a federal habeas court may still review that court's merits analysis and apply AEDPA deference to that adjudication.") (listing cases). If it did not, that claim also would be reviewed *de novo*. But the Court need not decide this issue because, as will be explained below, the claim fails under either standard of review.

*Rushinsky second interview tape*. McNeill asserts that the prosecution wrongfully

suppressed an audiotape of the police's second interview of Rushinsky, in which he states that McNeill wore a green or khaki hat the night of the murder and the detective corrects him to state that the hat was beige. McNeill alleges this statement casts additional doubt on Rushinsky's in-court identification of McNeill and "shows that the detectives investigating the murder were willing to coach their star witness to make his version of the offense more credible." (Doc. 144 at 49.)

This evidence was not favorable to McNeill, as it would not have "resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441. The detective and Rushinsky were merely debating how best to describe the alleged color of the shooter's hat, whether it was khaki, beige, or green. (Doc. 133-3 (Second Rushinsky Interview Tape) at 1.) This exchange would not have undermined Rushinsky's credibility in any significant way and did not constitute improper coaching on the detective's part. This claim lacks merit.

*Second-suspect police report.* McNeill next complains that the prosecution should have disclosed a LPD report that stated police first on the scene of the crime provided two descriptions of the fleeing suspect, and that an anonymous caller reported a male had abandoned a car near the crime scene and ran away. McNeill contends that this evidence would have supported his mistaken-identity defense, undermined Rushinsky's credibility, and presented an alternate suspect to investigate and possibly identify at trial. (Doc. 144 at 50.)

This evidence also was not favorable to McNeill. The report explained that the police located the owner of the car thought abandoned and determined that he was not

involved in the shooting.  (Doc. 116-3 at 528 (Second-Suspect Police Report).)  And McNeill offers no plausible reason or other evidence refuting the police's determination that the car owner was not a suspect in the case.  *See Jamison*, 291 F.3d at 390-91 (noting that "we do not hold that the state must turn over every last suspect considered in the course of an investigation," but finding evidence about another potential suspect material in that case because "enough factors coincided" with that information).

This claim, too, lacks any merit, and the state appellate court on post-conviction review reasonably concluded that this report did not "suggest[] that the state did anything improper."  *McNeill*, 137 Ohio App. 3d at 41.

*Roseboro interview tape*.  McNeill claims that the prosecution also suppressed a taped interview of Marko Roseboro that supported his alibi.  (Doc. 144 at 50-51.)  But this evidence does not meet *Brady's* suppression requirement, as it was not in the prosecution's exclusive control.  *Cone*, 161 F.3d at 344.  McNeill "knew or should have known the essential facts permitting him to take advantage of any exculpatory information" Roseboro may have possessed.  *Cone,* 161 F.3d at 344 (internal quotation marks and citations omitted).  McNeill filed a notice of alibi with the trial court, "propos[ing] to offer testimony that he was with Mark Rosoboro [*sic*], in Wilkes Villa, in Elyria, Ohio."  (Doc. 97-1 (Notice of Alibi).)[23]  He also listed Roseboro as a witness, and the State did not.  (See Doc. 116-1 at

_____

[23] The Court notes that there are actually two notices of alibi in the record.  The notice of McNeill's Roseboro alibi is time-stamped April 6, 1995.  (Doc. 97-1 (Notice of Alibi).)  Respondent submitted it as an exhibit to a brief opposing McNeill's motion to stay these federal habeas proceedings so that he could exhaust his *Brady* claims.  (*See* Doc. 97.)  The trial court's docket records one notice of alibi filed by McNeill, and it was filed on that April 1995 date.  (*See* Doc. 116-1 at 7 (Trial-Court Docket).)  The notice of alibi Respondent submitted in the appendix to her return of writ, however, is different.  It states as McNeill's alibi that he "was at the residence of his mother in Lorain, Ohio."  (Doc. 116-1 at 143 (Notice of Alibi).)  This notice of

147-48 (Defendant's Supplemental Response to Discovery, 167-68 (State's Supplemental Discovery).)  McNeill therefore could have obtained any information he sought to support his alibi from Roseboro himself, and the prosecution was under no obligation to provide information about Roseboro.  This claim is meritless.

*Evidence regarding Rushinsky's initial failure to identify McNeill in a photo lineup.*
McNeill also asserts that the prosecution suppressed evidence that Rushinsky failed to identify him from the first photo lineup at his first police interview, conducted the night of the shooting.  (Doc. 144 at 48-49.)  This initial photo array was recorded on audiotape, he asserts, but that portion of the tape was not played at the *in camera* hearing after Rushinsky's direct examination.  (Doc. 133-2 (Jt. Submission of Transcripts / Rushinsky First Interview Tape).)  The information also was included in a police report summarizing the interview, which also was never produced to defense counsel before or during the trial. (Doc. 116-3 at 527 (Rushinsky Police Report).)

McNeill supports this claim with an affidavit of his trial attorney, Joseph Grunda, who attests that "to the best of [his] recall" the prosecution never told him that Rushinsky failed to identify McNeill, and if they had, he "would have vigorously cross-examined him on that point."  (Doc. 118-1 at 25 (Grunda Aff.).)  Attorney Grunda further states that the tape played at trial of the Rushinsky interview never mentioned this first photo array.  (*Id.*)

_____

alibi is time-stamped July 16, 1996, and was filed at the direction of the court of appeals on McNeill's unopposed motion to supplement the record because "the Notice of Alibi filed by Appellant's trial counsel was listed on the docket as T.d. 63, but was not physically in the record, and, therefore, did not become part of the appellate record."  (Doc. 116-1 at 290-96 (Motion to Supplement the Record); *see also* Doc. 116-1 at 307 (Journal Entry Granting Motion to Supplement the Record), 308-09 (State's Response to Defendant's Motion to Supplement the Record).)

Clearly, the fact that Rushinsky was initially unable to identify McNeill from a photo array the night of the shooting was favorable to the defense. As Rushinsky was the state's only adult eyewitness, his credibility was a central issue in the case and a failure to identify McNeill would have been relevant impeachment evidence.

Respondent vigorously contests, however, that this evidence was suppressed. She first argues that the LPD report describing Rushinsky's first police interview was not suppressed because it was not discoverable under Ohio criminal procedure rules at the time of McNeill's trial. (Doc. 141 at 103.) State rules of criminal procedure, however, do not shield state officials from their obligation under *Brady* to disclose material exculpatory or impeachment evidence to defendants. *See, e.g., Strickler*, 527 U.S. at 283, and n.30 (1999) (noting that "[e]ven pursuant to the broader discovery provisions afforded at trial, petitioner would not have had access to these materials under [a Virginia court rule similar to Ohio's former Criminal Procedure Rule 16(B)(1)(g)], except as modified by *Brady*"); *United States v. Todd,* 920 F.2d 399, 405 (6th Cir. 1990) ("The Supreme Court has made clear that the *Brady* rule is not an evidentiary rule . . . ."); *Cunningham v. Hudson*, No. 3:06cv167, 2008 WL 2390777, at *11 (N.D. Ohio June 9, 2008) (noting that "unless these statements [in a police report] were exculpatory under *Brady*, there was no obligation to turn them over to defense counsel" under Ohio Criminal Procedure Rule 16(B)(1)(g)). The State failed to disclose this report despite numerous requests from McNeill before and after trial, and McNeill's post-conviction counsel found it only by searching the record of another lawsuit.

Respondent also contends that the Rushinsky interview audiotape was not suppressed. She first stresses that the entire tape, including the initial photo array, was

played to defense counsel at the *in camera* hearing, and McNeill has not shown otherwise. (Doc. 141 at 103-05.) The trial transcript, she notes, states that the Rushinsky interview "tape was played in its entirety." (*Id*. at 104 (quoting Doc. 117-4 at 71 (Trial Tr.).) Second, she invokes the invited-error doctrine, asserting that it was McNeill's fault that the recording was not transcribed and placed into the trial-court record, and he therefore should not "be permitted to accuse the State of wrongdoing."[24] (*Id*. at 103-04 (citing *Fields v. Bagley*, 275 F.3d 478, 485-86 (6th Cir. 2001)).) Third, she maintains that it is "absolutely incredible" that the State would play the beginning of the tape, in which Rushinsky provides his name and some identifying personal information, then skip the photo lineup portion, and then play the remainder of the tape, or not play the identification portion at all. (*Id*. at 105, and n.14.) Finally, she argues that McNeill's trial counsel's assertion that the portion of the tape including the initial photo array was not played is not credible, as he stated numerous times at a 2005 deposition conducted in this case that he could not recall specific events of the trial. (*Id*. at 106.)

As McNeill points out, however, even if the entire tape was played to defense counsel at the hearing, the recording itself does not show that Rushinsky failed to identify McNeill after seeing the initial photo array. The tape records Rushinsky stating "no" after being shown a series of photos, but there is no way of knowing that McNeill's photo was among them. (*See* Doc. 133-2 at 1 (First Rushinsky Interview Tape Tr.).) And Respondent does not allege, nor does the record demonstrate, that the prosecution otherwise disclosed

_____

[24] Respondent goes so far as to accuse McNeill's trial counsel of failing to make the tape part of the trial record as an "intentional decision to engage in gamesmanship" by "invit[ing] error [to] stave-off an execution." (Doc. 145 at 23.) There is no evidence to support this allegation.

the fact that this initial photo array took place to the defense before or during the trial. For purposes of *Brady*'s suppression requirement, it is the exculpatory or impeachment *information* that is at issue, not the particular format in which that information is conveyed.

Moreover, as McNeill reasonably argues, it is unlikely that, had defense counsel known that the State's key witness and the only adult eyewitness to the murder initially failed to identify the defendant just hours after the shooting, they would not have asked him a single question about it in cross-examination. And it is not reasonable to construe as either invited error or negligent representation defense counsel's lack of insistence that this tape, which the prosecution played before the judge and in accordance with procedural rules, be transcribed and placed into the record. As the Supreme Court has observed, "[t]he presumption, well established by tradition and experience, that prosecutors have fully discharged their official duties, is inconsistent with the novel suggestion that conscientious defense counsel have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred." *Strickler*, 527 U.S. at 286-87 (internal quotation marks and citation omitted). *See also Banks*, 540 U.S. at 694 ("If it was reasonable for Banks to rely on the prosecution's full disclosure representation, it was also appropriate for Banks to assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction.") (citing *Berger v. United States*, 295 U.S. 78, 88 (1935); *Strickler*, 527 U.S. at 284). It is likely, therefore, that the prosecution suppressed this evidence.

But even if the evidence was suppressed, there is no *Brady* violation here because this evidence is not "material." McNeill argues that if the defense had known about

Rushinsky's failure to identify him, along with his descriptions of the gun and the shooter's clothing that were inconsistent with other witnesses, they could have better developed their mistaken-identity defense in preparing cross-examinations of State witnesses, for example, and hiring experts on eyewitness identification. (Doc. 137 at 68.) Even more significantly, Rushinsky's pretrial failure to identify him "casts serious doubt" on Rushinsky's in-court identification of McNeill. (*See id*. at 51.) This is especially true, he maintains, in light of the "'inherently suspect qualities of eyewitness identification evidence,'" (*id*. (quoting *Watkins v. Sowders*, 449 U.S. 241, 350 (1981) (Brennan, J., dissenting))), most notably when the witness and suspect do not share racial identity (*id.* (citing Sheri L. Johnson, Cross-Racial Identification in Criminal Cases, 69 Cornell L. Rev. 934, 937 (1981))). McNeill further notes that Rushinsky testified at trial that he had a "pretty bad" addiction to cocaine and had a "hit" of crack cocaine and shared a 40-ounce can of beer with Fulton the evening of the shooting. (*Id*. (citing Doc. 117-4 (Trial Tr.) at 74-79).) Finally, Rushinsky's credibility was already undermined by the other inconsistencies between his interview with the police and his testimony, especially that he lied to the police about knowing McNeill and buying drugs from him in the past. (Doc. 144 at 60.)

Moreover, McNeill asserts, the State's other evidence against him was "weak." (Doc. 144 at 52-53.) McNeill stresses that the State had no physical evidence linking McNeill to the crime, such as a gun or his fingerprints in the car. (*Id*. at 54.) And Rushinsky's testimony received "only marginal support" from the testimony of the four children witnesses, who ranged in age from six to eight years old, which he claims was inconsistent, contradictory, and unreliable." (*Id*. at 52-53.) For example, he points out, one

child acknowledged on cross-examination that she did not actually see the shooting and stated only two people were in the car, which is inconsistent with Rushinsky's version of events. (Doc. 117-4 (Trial Tr.) at 173-74, 176-77.) Another conceded that she was able to identify McNeill "really because" a prosecutor had shown her his photograph. (*Id*. at 204.) When questioned whether he had even seen anyone get shot, a third child responded, "yeah - - no," and testified that the victim was shot while sitting in the passenger's seat. (*Id*. at 221, 235.) And the fourth child testified that he saw only two people inside the car when it pulled up and nobody in the back seat, which conflicts with Rushinsky's account that the victim was driving and McNeill was in the back seat. (*Id*. at 249.)

McNeill cites several cases in which the Supreme Court has held that concealed impeachment evidence was material for *Brady* purposes because the witness's testimony was critical to the prosecution's case, including *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) ("Beyond doubt, the newly revealed evidence suffices to undermine confidence in Wearry's conviction. The State's trial evidence resembles a house of cards, built on the jury crediting Scott's account rather than Wearry's alibi."); *Smith,* 565 U.S. at 76 (undisclosed statements of eyewitness that he "could not ID anyone because [he] couldn't see faces" and "would not know them if [he] saw them" were "plainly material" where his testimony was the "*only* evidence" linking defendant to the crime and the statement "directly contradict[ed] his testimony"); *Banks*, 540 U.S. at 701 (witness' undisclosed informant status was "material" where witness gave "critical" and "uncorroborated" testimony); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (where prosecution "depended almost entirely" on witness' testimony, government's undisclosed promise of immunity to witness was

"material").

The Supreme Court also has observed, however, that "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith*, 565 U.S. at 76 (citing *United States v. Agurs*, 427 U.S. 97, 112-13, and n. 21 (1976)). And in this case, unlike the cases McNeill cites, Rushinsky's testimony was corroborated by other evidence. Three children testified that they knew McNeill and that he shot the man in the car, and were thoroughly cross-examined to test their reliability. (Doc. 117-4 (Trial Tr.) at 161, 222-23, 240-41.) McNeill's former girlfriend, Kimberly Sanford, testified that day of the incident McNeill asked her for $30 and threatened her with a gun. (Doc. 117-5 (Trial Tr.) at 6-8.) Detective Berrios testified that McNeill had sold drugs on the same corner that Rushinsky claimed they found McNeill the evening of the murder. (*Id*. at 26-28.) Detective Berrios also testified that three days after Fulton's murder, he and two other detectives found McNeill hiding in a closet behind a large pile of clothes. (*Id*. at 28-29.) The car in which the murder took place was parked almost in front of McNeill's house. (*Id*. at 36-37.) And Fulton had $20 in his possession when he died. (*Id*. at 39-40.)

Accordingly, the State's suppression of the Rushinsky interview tape and the related police report, revealing Rushinsky's initial failure to identify McNeill from a photo array, does not "undermine confidence in the verdict" or raise any "reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed." *Strickler*, 527 U.S. at 289–90. McNeill's seventh ground for relief is unfounded.

### b. *Napue* claim

McNeill argues that his due-process rights under *Napue* were violated "when the prosecution withheld exculpatory evidence and intentionally created a materially false impression at trial." (Doc. 144 at 140.) *Napue* holds that "a conviction obtained through the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury." *Agurs*, 427 U.S. at 103. As Respondent argues, however, McNeill bases his claim on the prosecution creating a false *impression* at trial through their alleged concealment of evidence, not the prosecution's knowing use of false *testimony*. McNeill presents no authority that *Napue* applies in that context, and this claim also fails. *Cf. United States v. Angel,* 355 F.3d 462, 475 (6th Cir. 2004) (rejecting petitioner's claim that the alleged perjured testimony "could have affected the jury's verdict," where the testimony was presented to the grand jury but not offered at trial).

### F.    Thirteenth and Fourteenth Grounds for Relief: *Insufficient Evidence*

For his thirteenth and fourteenth grounds for relief, McNeill claims that his conviction for aggravated murder with a felony-murder death-penalty specification was not supported by constitutionally sufficient evidence. (*See* Doc. 144 at 98-102.) He argues the evidence did not show beyond a reasonable doubt that he committed aggravated robbery of Fulton's money or car, and even if it did, the evidence was still insufficient to demonstrate that he murdered Fulton while committing or attempting to commit aggravated as required to support the aggravated-murder and felony-murder specification convictions. (*Id*. at 98-99.) McNeill raised these claims in state courts on direct appeal (*see* Doc. 116-2 at 68-70),

and they were adjudicated on the merits. These claims, therefore, are preserved for federal

habeas review.

In rejecting McNeill's sufficiency claims, the Ohio Supreme Court reasoned:

In his first and second propositions of law, McNeill contends that he is not guilty of aggravated murder under R.C. 2903.01(B) and that the R.C. 2929.04(A)(7) death specification is inapplicable because the state failed to prove he killed Fulton while attempting to commit aggravated robbery.

McNeill argues the attempted aggravated robbery ended the moment he walked away from Fulton's car. When McNeill returned and killed Fulton, the killing was "a new and separate crime" that did not occur while he was attempting to rob Fulton.

The term "while" in R.C. 2903.01(B), Ohio's felony-murder statute, neither requires that the killing occur at the same instant as the predicate felony, nor requires that the killing be caused by the predicate felony. Rather, the killing must be directly associated with the predicate felony as part of one continuous occurrence. *State v. Cooey* (1989), 46 Ohio St.3d 20, 23, 544 N.E.2d 895, 903.

Because the killing and predicate felony need not be simultaneous in order to constitute a felony-murder, the technical completion of one before the commission of the other does not remove a murder from the ambit of R.C. 2903.01(B). See, *e.g.*, *State v. Smith* (1991), 61 Ohio St.3d 284, 290, 574 N.E.2d 510, 516. "[T]he question whether [the defendant] killed before he stole or stole [or attempted to steal] before he killed is of no consequence." *State v. Palmer* (1997), 80 Ohio St.3d 543, 571, 687 N.E.2d 685, 709.

The sequence of events in this case, examined in light of time, place, and causal connection, amounts to "one continuous occurrence." First, the attempted aggravated robbery and the killing were closely connected in time. Although the precise time lapse between McNeill's exit from Fulton's car and his return is unknown, a trier of fact could infer from the testimony of Rushinsky and Brittany Pasenow, one of the four child witnesses, that McNeill returned within a few minutes.

Second, the two crimes occurred in the same place. Because McNeill took Fulton's keys, Fulton was unable to leave between the robbery attempt and the murder. Third, and most significant, the murder would not and could not have occurred but for the attempted robbery. Had McNeill not taken Fulton's keys in attempting the robbery, Fulton could (and presumably would) have driven away.

McNeill also argues that robbery was not the motive for the killing, as shown by the fact he did not take Fulton's money after the shooting; rather, McNeill claims he shot Fulton because he felt humiliated. But R.C. 2903.01(B) does not require that the felony be the motive for the killing. See *State v. Williams* (1996), 74 Ohio St.3d 569, 576–578, 660 N.E.2d 724, 732–733. McNeill cannot " 'escape the effect of the felony-murder rule' " by claiming that the murder was an unrelated "afterthought." See *Palmer*, 80 Ohio St.3d at 572, 687 N.E.2d at 709, quoting *State v. Biros* (1997), 78 Ohio St.3d 426, 451, 678 N.E.2d 891, 912.

Our review indicates sufficient evidence supporting the jury's guilty verdict. On these particular facts, McNeill's brief departure before returning to murder Fulton is without legal significance. McNeill's first and second propositions of law are therefore overruled.

*McNeill*, 83 Ohio St. 3d at 440-41.

The Due Process Clause of the Fourteenth Amendment requires a state to prove every element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). When reviewing a claim of insufficient evidence, habeas courts must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

Because both *Jackson* and AEDPA apply to McNeill's sufficiency claims, federal habeas review requires deference at two levels. " 'First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by [the] AEDPA.' " *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652,

656 (6th Cir. 2008)).  The Sixth Circuit has explained:

> When reviewing whether the state court's determination was "objectively unreasonable," this court necessarily engages in a two-step analysis. First, we must ask whether the evidence itself was sufficient to convict under *Jackson*. The inquiry ends if the panel determines that there was sufficient evidence to convict [the petitioner]. If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010).  The circuit court has further observed that "'[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'"  *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

McNeill has not met this burden.  The felony-murder provisions of Ohio's aggravated-murder statute and death-penalty specifications apply to murders that occurred "while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit" aggravated robbery.  Ohio Rev. Code § 2903(B), § 2929.04(A)(7). McNeill appears to be making essentially the same argument here that he advanced in state courts:  He claims that the "there was an insufficient nexus between the alleged robbery and homicide" to show that he murdered Fulton "while" he was robbing or attempting to rob him.  (*See* Doc. 144 at 102.)  He contends that his attempted robbery of the $20 and his robbery of the car keys were "completed crimes" when he walked away from Fulton's car. (Doc. 137 at 84.)  And when he returned to the car, he argues, his purpose was not to try again to steal Fulton's money or car; he intended only to harm Fulton "out of anger or retribution for Blake Fulton's perceived attempt to humiliate him or show him up."  (Doc. 144 at 102.)

McNeill's real quarrel here is not with the state court's "overly expansive view of the evidence," as he suggests (*id*.), but with the court's interpretation of Ohio's felony-murder rule – to which this Court is bound.  "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

The Ohio Supreme Court explained that Ohio's felony-murder rule does not require that the killing and predicate felony be simultaneous, or that the felony caused the killing, or that the felony was the motive for the killing.  *McNeill*, 83 Ohio St. 3d at 440-41.  Rather, "the killing must be directly associated with the predicate felony as part of one continuous occurrence."  *Id*. at 440.  Given this definition of Ohio's felony-murder rule, the state court reasonably concluded that the events unfolded in the case in "one continuous occurrence," and "McNeill's brief departure before returning to murder Fulton [was] without legal significance."  *Id*. at 441.  As it explained, the evidence demonstrated that the attempted aggravated robbery and murder were "closely connected in time," even though McNeill left the scene briefly; both crimes occurred in and around Fulton's car; and if McNeill had not attempted to rob Fulton by taking the car keys, the  murder "would not and could not have occurred . . . ."  *Id*.  McNeill does not contest this evidence.  What he contests is the court's interpretation of the rule.

A rational jury, viewing this evidence in the light most favorable to the prosecution, could have found the essential elements of aggravated murder with a felony-murder death specification beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319.  The Ohio Supreme Court's decision, therefore, was neither contrary to, nor an unreasonable application of

*Jackson,* and McNeill's thirteenth and fourteenth grounds for relief lack merit.

### G.      Sixteenth Ground for Relief:  *Ineffective Assistance of Trial Counsel*

McNeill's sixteenth ground for relief alleges his trial counsel provided

constitutionally ineffective assistance.  (*See* Doc. 144 at 110-31.)  In his traverse, he asserts

that trial counsel:

a.      failed to question potential jurors about their attitudes toward race;

b.      failed to question potential jurors about their attitudes toward drugs and drug dealing;

c.      "were ineffective or induced to be ineffective due to the suppression of evidence by the prosecutor's office";

d.      failed to timely object to the jury panel on the ground that African-Americans were underrepresented on the panel;

e.      failed to object to the prosecutor's "prejudicial" arguments;

f.      failed to object to hearsay and other improper testimony of T.R.;

g.      failed to "adequately object" to the admission of evidence regarding McNeill's previous drug offense, investigate the facts of that alleged offense, and seek a limiting instruction regarding that evidence; and

h.      failed to object to the trial court's unconstitutionally vague definition of "recklessness."

(Doc. 144 at 110-12.)[25]

### 1.      Procedural Posture

Respondent states that McNeill raised all but sub-claims (c) and (g), as listed above,

in state courts on direct appeal.  (Doc. 145 at 31.)  The Court agrees that McNeill presented

---

[25] McNeill concedes in his traverse that the Sixth Circuit has rejected several ineffective-assistance claims asserted in his amended petition based on trial counsel's failure to object to allegedly erroneous jury instructions, and has therefore waived those claims.  (Doc. 144 at 111-12 nn.17-19.)

sub-claims (a), (d)-(f), and (h) to state courts on direct appeal, and they were adjudicated on their merits. *See McNeill*, 83 Ohio St. 3d at 448-50. McNeill did not, however, assert in state courts a claim that counsel was ineffective for failing to question potential jurors about their attitudes toward drugs and drug dealing, (b) as listed above. (*See* Doc. 116-1 at 375; Doc. 116-2 at 123.) But Respondent does not assert a procedural-default defense as to that claim, and it is therefore waived. *See Trest v. Cain*, 522 U.S. 87, 89 (1997). Accordingly, all sub-claims except (c) and (g) are preserved for habeas review.

Respondent argues that sub-claims (c) and (g) are procedurally defaulted because McNeill failed to "properly raise them in state court." (Doc. 145 at 31.) The Court agrees. McNeill could have raised sub-claim (c), relating to the prosecution's alleged suppression of evidence, in state post-conviction proceedings along with his suppressed-evidence claims. Sub-claim (g) arose out of the record of proceedings in the trial court, and therefore could have been raised on direct appeal. But McNeill failed to do so in either case, and under Ohio law, *res judicata* now prohibits him from raising the issue in any post-conviction proceeding. *See Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."); *State v. Perry*, 10 Ohio St. 2d 175 (Ohio 1967) (holding that *res judicata* bars a criminal defendant from raising in post-conviction proceedings those claims that could have been raised on direct appeal). With no state-court remedies still available to him, Petitioner has defaulted this claim. *See Gray v. Netherland*, 518 U.S. 152, 161–62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied

'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("[I]f an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review.").

McNeill does not offer any cause for the default or prejudice that resulted from it. (*See* Doc. 144 at 119.)  Rather, he alleges that the default should be excused because he is actually innocent of the charges.  (*Id*.)  As explained above, the Court rejects that argument. Sub-claims (c) and (g), as listed above, are procedurally defaulted.

### 2.     Merits Analysis

Even if all of McNeill's ineffective-assistance claims were ripe for habeas review, they would not succeed.[26]  The Sixth Amendment right to the effective assistance of counsel at trial has long been recognized as a "bedrock principle in our justice system."  *Martinez v. Ryan*, 566 U.S. 1, 12 (2012); *see also Gideon v. Wainwright*, 372 U.S. 335, 342-44 (1963). The Supreme Court announced a two-prong test for ineffective-assistance claims in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id* at 687.  To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation fell "below an objective standard of reasonableness."  *Id.* at 688.  It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.

---

[26] Again, the Court applies AEDPA deferential review to the claims raised in state court and adjudicated on the merits; it reviews the claims never litigated in state court *de novo*.

Second, the petitioner must show that he or she was prejudiced by counsel's errors. To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* at 693 (citation omitted). Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail. *Id.* Ineffective-assistance claims are mixed questions of law and fact. *Id.* at 698. Habeas courts review such claims, therefore, under AEDPA's "unreasonable application" prong, § 2254(d)(1). *See, e.g., Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003).

"'Surmounting *Strickland*'s high bar is never an easy task.'" *Harrington v. Richter,* 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). The Court has explained,

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.

*Id.* (internal quotation marks and citations omitted). Therefore, "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ." *Strickland,* 466 U.S. at 689. "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel

123

'made all significant decisions in the exercise of reasonable professional judgment,'"

recognizing "'the constitutionally protected independence of counsel and . . . the wide

latitude counsel must have in making tactical decisions.'" *Cullen v. Pinholster*, 563 U.S.

170, 195 (2011) (quoting *Strickland*, 466 U.S. at 689-90).

Indeed, the standards imposed by *Strickland* and § 2254(d) are both "highly

deferential," so that in applying them together, "review is 'doubly' so." *Harrington,* 562

U.S. at 105 (internal quotation marks and citations omitted). The Supreme Court has

cautioned:

> Federal habeas courts must guard against the danger of equating
> unreasonableness under *Strickland* with unreasonableness under § 2254(d).
> When § 2254(d) applies, the question is not whether counsel's actions were
> reasonable. The question is whether there is any reasonable argument that
> counsel satisfied *Strickland's* deferential standard.

*Id*.

### a.   failing to question potential jurors about race

McNeill first complains that his trial counsel were deficient in failing to question the

venire about their "racial attitudes," despite the potential for "racial bias" in a case charging

an African-American man with murdering a white man. (Doc. 137 at 92.) Trial counsel's

questioning during voir dire, however, is presumed to be a matter of sound trial strategy.

*See, e.g., Keith v. Mitchell*, 455 F.3d 662, 676 (6th Cir. 2006) (noting the "particular

deference" owed to counsel's decisions when conducting voir dire) (citing *Hughes v. United

States*, 258 F.3d 453, 457 (6th Cir. 2001)); *Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir.

2001) ("Stanford presents no evidence to counteract our presumption that his counsel's

failure to ask life-qualifying questions during general voir dire constituted trial strategy.").

And McNeill offers no evidence at all to rebut that presumption. One can only speculate

about counsel's reasons for not asking the venire questions about race.  *Stanford*, 266 F.3d at 454.  It is possible, for example, that counsel was concerned such questions would be offensive to potential jurors or unlikely to actually uncover conscious or unconscious bias.  Accordingly, there is no basis for McNeill's claim that his counsel were ineffective in failing to question potential jurors about their views on race, and this claim fails.  *See Stojetz v. Ishee*, 892 F.3d 175, 194-95 (6th Cir. 2018) (rejecting petitioner's *per se* ineffective-assistance claim based on trial counsel's failure to ask venire questions about racial attitudes).

### b.  failing to question potential jurors about drugs

McNeill contends his trial counsel also should have inquired about potential jurors' views on drugs and drug dealing.  (Doc. 137 at 92.)  Again, however, he presents no evidence to support this claim and rebut the presumption that counsel had a sound strategy to avoid such questioning.  This claim, too, is unfounded.

### c.  ineffectiveness relating to alleged suppressed evidence

McNeill also asserts, with no argumentation whatsoever, that counsel were "ineffective or induced to be ineffective" during "pre-trial proceedings" because of the prosecution's alleged suppression of evidence.  (*Id*. at 116.)  It is unclear what aspect of counsel's pretrial performance McNeill is challenging.  This allegation is too vague and conclusory to state a claim under *Strickland*, and it is denied.  *See, e.g.,United States v. Crosgrove,* 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address [the defendant's] general assertions of misconduct in witness questioning and closing statements."); *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) ("'[I]ssues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).

### d. failing to timely object to jury panel

McNeill further argues that his counsel should have timely objected to the jury panel on the ground that African-Americans were underrepresented. (Doc. 137 at 92.) The Ohio Supreme Court rejected this claim, stating:

> McNeill also claims he was prejudiced by counsel's failure to make a timely objection to the venire's alleged racial imbalance. Because the trial court considered the objection despite its tardiness, any such error was nonprejudicial.

*McNeill*, 83 Ohio St. 3d at 449. McNeill does not explain how this decision misconstrues or unreasonably applies *Strickland* or its progeny, and this Court can find no basis to conclude that it does. Moreover, any finding of prejudice from this alleged ineffective assistance is also precluded because this Court has found no merit in McNeill's claim that African-Americans were underrepresented in the pool from which his jury was selected. This claim, too, fails.

### e. failing to object to prosecutor's arguments

McNeill complains that his counsel were ineffective for failing to object to the prosecution's "prejudicial" closing arguments. (Doc. 144 at 111.) He specifically challenges the prosecutors' statements that the State's case was "uncontradicted"; their use of victim impact evidence; and their accusations that defenses counsel played "fast and loose with the facts." (*Id*.) McNeill also based several of his prosecutorial-misconduct claims in his eighth ground for relief on these same statements.

The Ohio Supreme Court rejected these claims, concluding:

> McNeill maintains he was prejudiced by defense counsel's failure to object to

the state's closing argument. However, an attorney may reasonably elect not to interrupt opposing counsel's argument. See *State v. Keene* (1998), 81 Ohio St.3d 646, 668, 693 N.E.2d 246, 264.

*McNeill*, 83 Ohio St. 3d at 450. McNeill presents no developed argument as to how this decision is contrary to, or an unreasonable application of *Strickland* or any other Supreme Court precedent. Moreover, McNeill cannot establish that he was prejudiced by counsel's failure to object to statements this Court has found were not constitutionally improper. This claim is unfounded.

### f.      failing to object to T.R.'s testimony

McNeill asserts that his trial counsel erred by failing to object to the hearsay testimony of one of the child witnesses, T.R. (Doc. 144 at 115.) The Ohio Supreme Court reviewed this claim and determined:

> During her direct examination, state's witness [T.R.] testified to the facts of the shooting and to McNeill's eventual hiding place. McNeill argues defense counsel's failure to object to this testimony as hearsay was prejudicial. However, the prosecutor immediately established [T.R.'s] knowledge of these matters was based on hearsay, and cautioned her to "only tell us what you saw." Moreover, the testimony in question was merely cumulative, and could be viewed as impeaching [T.R.] by displaying her lack of personal knowledge. Because the unreliability of the child witnesses was a key theme in defense closing arguments, we cannot hold defense counsel's failure to object was a professionally unreasonable choice.

*McNeill*, 83 Ohio St. 3d at 449. As Respondent argues, McNeill does not even attempt to explain why this decision was unreasonable or how he was prejudiced by the challenged testimony. (Doc. 141 at 67.)

Indeed, "the Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isacc*, 456 U.S. 107, 134 (1982). The Sixth Circuit has observed:

> [I]n a trial of any size, numerous potentially objectionable events occur. . . . [E]xperienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. Learned counsel therefore use objections in a tactical manner. In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.

*Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006). The state court reasonably concluded that T.R.'s testimony was not prejudicial, as it was cumulative and impeaching, defense counsel emphasized the unreliability of the child witnesses in general, and the prosecution used cautionary language in questioning T.R. in particular. This claim lacks merit.

### g. failing to object to, investigate, and seek limiting instruction regarding drug-offense evidence

McNeill further claims that his trial counsel should have "more vigorously" objected to the State's evidence concerning his prior drug offense, and should have investigated into, and sought a limiting instruction regarding, that evidence. (Doc. 144 at 115.) But McNeill's counsel did object to this evidence, introduced through narcotics detective Berrios, as impermissible character evidence, and the trial court carefully considered the objection. (*See* 117-5 (Trial Tr.) at 18.) The judge held an *in camera* hearing regarding the objection to determine the nature of the testimony and its admissibility. (*See id*. at 18-23.) The prosecutor explained to the court that Detective Berrios' testimony would corroborate Rushinsky's testimony and establish identity, knowledge, and opportunity, as Berrios had arrested McNeill at the same location that Rushinsky testified he and Fulton found him selling drugs the night of the murder. (*Id*. at 19-20.) The court confirmed the content of the

testimony with the witness and his first-hand knowledge of the events he was to describe. (*Id*. at 20-21.)  Defense counsel then asked a few follow-up questions of the witness.  (*Id*. at 21-22.)  Finally, the court considered a legal brief on the issue prepared by the prosecution. (*Id*. at 22-23.)  Counsel objected to this testimony, therefore, and McNeill does not demonstrate that a "more vigorous" objection would have been sustained.

Moreover, McNeill does not provide any argument establishing prejudice resulting from counsel's alleged failure to investigate or seek a limiting instruction regarding the evidence.  He does not show, for example, what an investigation could have uncovered or how a limiting instruction would have changed the outcome of the trial.  This claim fails.

### h.  failing to object to "recklessness" jury instruction

Finally, McNeill maintains that counsel were ineffective in failing to object to the trial court's jury instruction on "recklessness."  (Doc. 144 at 112.)  He argues that the trial court's definition of "recklessness" was unconstitutionally vague because it defined a reckless person as one who "perversely disregards a known risk," and the term "perversely" would not guide a juror of "ordinary sensibility" in his or her deliberations.  (Doc. 137 at 93.)

The Ohio Supreme Court addressed this claim as follows:

> McNeill argues counsel were deficient in failing to object to . . . guilt-phase instructions defining . . . "recklessness" . . . . However, these objections were not supported by—indeed, most were inconsistent with—existing law. See *State v. Gumm*, 73 Ohio St.3d at 419, 653 N.E.2d at 261, and syllabus; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 421–422 and 424–425, 613 N.E.2d 212, 219 and 221; *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542, 552; *State v. Young* (1988), 37 Ohio St.3d 249, 252–253, 525 N.E.2d 1363, 1368–1369, reversed on other grounds *Osborne v. Ohio* (1990), 495 U.S. 103, 125–126, 110 S.Ct. 1691, 1705, 109 L.Ed.2d 98, 119–120; *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph two of the syllabus, sentence vacated on other grounds *Nabozny v. Ohio* (1978), 439 U.S.

129

> 811, 99 S.Ct. 70, 58 L.Ed.2d 103. Defense counsel is not required to advance
> arguments lacking merit. See, *e.g., State v. Keene* (1998), 81 Ohio St.3d 646,
> 668, 693 N.E.2d 246, 264. It is not ineffective assistance for a trial lawyer to
> maneuver within the existing law, declining to present untested or rejected legal
> theories.

*McNeill*, 83 Ohio St. 3d at 448-49. As this Court is bound by a state court's interpretation

of state law, McNeill cannot show that his counsel were deficient for failing to object to a

jury instruction that complied with state law. This claim is meritless.

Accordingly, McNeill has not demonstrated that he is entitled to relief on his

ineffective-assistance claims or that the Ohio Supreme Court's decision rejecting them was

either contrary to, or an unreasonable application of, *Strickland* and its progeny. McNeill's

sixteenth ground for relief is denied.

### G.   Twenty-Sixth Ground for Relief:  *Cumulative Error*

Finally, McNeill claims that the Ohio courts' cumulative errors deprived him of his

rights to due process and a fair trial. (Doc. 144 at 132-39.) The Sixth Circuit, however,

repeatedly has held that a claim of cumulative trial error is not cognizable on federal habeas

review. *E.g., Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) ("[T]he law of this

Circuit is that cumulative error claims are not cognizable on habeas because the Supreme

Court has not spoken on this issue."). This ground for relief, therefore, is denied.

### CERTIFICATE OF APPEALABILITY ANALYSIS

The Court must now determine whether to grant a Certificate of Appealability

("COA") for any of McNeill's claims for relief. The Sixth Circuit has held that neither a

blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a

capital habeas case as it "undermine[s] the gate keeping function of certificates of

appealability, which ideally should separate the constitutional claims that merit the close

attention of counsel and this court from those claims that have little or no viability."

*Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d

466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's

analysis of claims).

Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C.

§ 2253, which provides in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (12) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-

AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.

The sole difference between the pre- and post-AEDPA statutes is that the petitioner must

now demonstrate he was denied a *constitutional*, rather than federal, right. *Slack v.*

*McDaniel*, 529 U.S. 473, 483-04 (2000) (interpreting the significance of the revision

between the pre- and post-AEDPA versions of that statute).

Furthermore, if a habeas claim is not procedurally defaulted, then the court need

only determine whether reasonable jurists would find the district court's decision "debatable

or wrong." *Id*. at 484. A more complicated analysis is required, however, when assessing

whether to grant a COA for a claim the district court has determined is procedurally

defaulted. In those instances, a COA should only issue if "jurists of reason would find it

debatable whether the petition states a valid claim of the denial of a constitutional right and

that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

After taking the above standards into consideration, the Court finds as follows:

The Court will not issue a COA for grounds for relief: 1 (right to counsel); 4 (jury composition); 5 (trial-court error / evidentiary rulings); 13 (insufficiency of evidence); 14 (insufficiency of evidence); 15 (trial-court error / evidentiary rulings); and 16 (ineffective assistance of counsel) (excluding sub-claims (c) and (g)). No jurist of reason would debate the Court's conclusions on these claims.

No COA will issue for grounds for relief: 6 (prosecutorial misconduct); 8 (prosecutorial misconduct); and 16 (ineffective assistance of counsel) (sub-claims (c) and (g)) because they are unequivocally procedurally defaulted.

In addition, no COA will issue for grounds for relief: 25 (Ohio's post-conviction process) and 26 (cumulative error) because they are not cognizable on federal habeas review.

The Court will issue a COA for McNeill's grounds for relief: 7 (suppressed evidence) and 27 (false testimony). A reasonable jurist could debate the Court's conclusions regarding these claims.

## CONCLUSION

For the foregoing reasons, this Court denies McNeill's Amended Petition for Writ of Habeas Corpus (Doc. 137). The Court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to McNeill's seventh and twenty-seventh grounds for relief, and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure

22(b) as to those claims only.  As to all remaining claims, the Court certifies that, pursuant

to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith, and

that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c);

Fed. R. App. P. 22(b).

IT IS SO ORDERED.


 s/*Dan Aaron Polster*

Date:  August 26, 2019                     Dan Aaron Polster
                                           United States District Judge